# MUNN *v.* ILLINOIS.

1. Under the powers inherent in every sovereignty, a government may regulate the conduct of its citizens toward each other, and, when necessary for the public good, the manner in which each shall use his own property.

2. It has, in the exercise of these powers, been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, &c., and, in so doing, to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold.

3 Down to the time of the adoption of the fourteenth amendment of the Constitution of the United States, it was not supposed that statutes regulating the use, or even the price of the use, of private property necessarily deprived an owner of his property without due process of law. Under some circumstances they may, but not under all. The amendment does not change the law in this particular : it simply prevents the States from doing that which will operate as such deprivation.

4 When the owner of property devotes it to a use in which the public has an interest, he in effect grants to the public an interest in such use, and must to the extent of that interest, submit to be controlled by the public, for the common good, as long as he maintains the use. He may withdraw his grant by discontinuing the use.

5 Rights of property, and to a reasonable compensation for its use, created by the common law, cannot be taken away without due process; but the law itself, as a rule of conduct, may, unless constitutional limitations forbid, be changed at the will of the legislature. The great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances.

6 The limitation by legislative enactment of the rate of charge for services

rendered in a public employment, or for the use of property in which the public has an interest, establishes no new principle in the law, but one gives a new effect to an old one.

7. Where warehouses are situated and their business is carried on exclusive within a State, she may, as a matter of domestic concern, prescribe regu-lations for them, notwithstanding they are used as instruments by those engaged in inter-state, as well as in State, commerce; and, until Congress acts in reference to their inter-state relations, such regulations can be en-forced, even though they may indirectly operate upon commerce beyond her immediate jurisdiction.

8. The court does not hold that a case may not arise in which it may be found that a State has, under the form of regulating her own affairs, encroached upon the exclusive domain of Congress in respect to inter-state commerce.

9. The ninth section of the first article of the Constitution of the United States operates only as a limitation of the powers of Congress, and in no respect affects the States in the regulation of their domestic affairs.

10. The act of the general assembly of Illinois, entitled "An Act to regulate public warehouses and the warehousing and inspection of grain, and to give effect to art. 13 of the Constitution of this State," approved April 25, 1871, is not repugnant to the Constitution of the United States.

ERROR to the Supreme Court of the State of Illinois.

The Constitution of Illinois, adopted in 1870, contains the following in reference to the inspection of grain, and the stor-age thereof in public warehouses: —

"ARTICLE XIII. — WAREHOUSES.

"SECTION 1. All elevators or storehouses where grain or other property is stored for a compensation, whether the property stored be kept separate or not, are declared to be public ware-houses.

"SECT. 2. The owner, lessee, or manager of each and every pub-lic warehouse situated in any town or city of not less than one hundred thousand inhabitants, shall make weekly statements under oath before some officer designated by law, and keep the same posted in some conspicuous place in the office of such warehouse; and shall also file a copy for public examination in such place as shall be designated by law, which statement shall correctly set forth the amount and grade of each and every kind of grain in such ware-house, together with such other property as may be stored therein; and what warehouse receipts have been issued, and are, at the time of making such statement, outstanding therefor; and shall, on the copy posted in the warehouse, note daily such changes as may be made in the quantity and grade of grain in such warehouse; and the different grades of grain shipped in separate lots shall not be

mixed with inferior or superior grades, without the consent of the owner or consignor thereof.

"SECT. 3. The owners of property stored in any warehouse, or holder of a receipt for the same, shall always be at liberty to examine such property stored, and all the books and records of the warehouse in regard to such property.

"SECT. 4. All railroad companies, and other common carriers on railroads, shall weigh or measure grain at points where it is shipped, and receipt for the full amount, and shall be responsible for the delivery of such amount to the owner or consignee thereof, at the place of destination.

"SECT. 5. All railroad companies receiving and transporting grain, in bulk or otherwise, shall deliver the same to any consignee thereof, or any elevator or public warehouse to which it may be consigned, provided such consignee, or the elevator, or public warehouse, can be reached by any track owned, leased, or used, or which can be used, by such railroad company; and all railroad companies shall permit connections to be made with their tracks, so that any such consignee, and any public warehouse, coal-bank, or coal-yard may be reached by the cars on said railroad.

"SECT. 6. It shall be the duty of the general assembly to pass all necessary laws to prevent the issue of false and fraudulent warehouse receipts, and to give full effect to this article of the Constitution, which shall be liberally construed, so as to protect producers and shippers. And the enumeration of the remedies herein named shall not be construed to deny to the general assembly the power to prescribe by law such other and further remedies as may be found expedient, or to deprive any person of existing common-law remedies.

"SECT. 7. The general assembly shall pass laws for the inspection of grain, for the protection of producers, shippers, and receivers of grain and produce."

The provisions of the act of the general assembly of Illinois, entitled "An Act to regulate public warehouses and the warehousing and inspection of grain, and to give effect to art. 13 of the Constitution of this State," approved April 25, 1871, so far as the same have any direct bearing upon the questions involved in this case, are as follows: —

"SECTION 1. Be it enacted by the people of the State of Illinois, represented in the general assembly, that public warehouses, as

defined in art. 13 of the Constitution of this State, shall be divided into three classes, to be designated as classes A, B, and C, respectively.

"SECT. 2. Public warehouses of class A shall embrace all warehouses, elevators, or granaries in which grain is stored in bulk, and in which the grain of different owners is mixed together, or in which grain is stored in such a manner that the identity of different lots or parcels cannot be accurately preserved, such warehouses, elevators, or granaries, being located in cities having not less than one hundred thousand inhabitants. Public warehouses of class B shall embrace all other warehouses, elevators, or granaries in which grain is stored in bulk, and in which the grain of different owners is mixed together. Public warehouses of class C shall embrace all other warehouses or places where property of any kind is stored for a consideration.

"SECT. 3. The proprietor, lessee, or manager of any public warehouse of class A shall be required, before transacting any business in such warehouse, to procure from the Circuit Court of the county a license, permitting such proprietor, lessee, or manager to transact business as a public warehouseman under the laws of this State, which license shall be issued by the clerk of said court upon a written application, which shall set forth the location and name of such warehouse, and the individual name of each person interested as owner or principal in the management of the same, or, if the warehouse be owned or managed by a corporation, the names of the president, secretary, and treasurer of such corporation shall be stated; and the license shall give authority to carry on and conduct the business of a public warehouse of class A in accordance with the laws of this State, and shall be revocable by the said court upon a summary proceeding before the court, upon complaint of any person in writing setting forth the particular violation of law, and upon satisfactory proof to be taken in such manner as may be directed by the court.

"SECT. 4. The person receiving a license as herein provided shall file, with the clerk of the court granting the same, a bond to the people of the State of Illinois, with good and sufficient surety, to be approved by said court, in the penal sum of $10,000, conditioned for the faithful performance of his duty as a public warehouseman of class A, and the full and unreserved compliance with all laws of this State in relation thereto.

"SECT. 5. Any person who shall transact the business of a public warehouse of class A without first procuring a license as herein

provided, or who shall continue to transact any such business after such license has been revoked (save only that he may be permitted to deliver property previously stored in such warehouse), shall, on conviction, be fined in a sum not less than $100 for each and every day such business is so carried on; and the court may refuse to renew any license, or grant a new one to any of the persons whose license has been revoked, within one year from the time the same was revoked."

"SECT. 15. Every warehouseman of public warehouses of class A shall be required, during the first week of January of each year, to publish in one or more of the newspapers (daily, if there be such) published in the city in which such warehouse is situated, a table or schedule of rates for the storage of grain in the warehouse during the ensuing year, which rates shall not be increased (except as provided for in sect. 16 of this act) during the year; and such published rates, or any published reduction of them, shall apply to all grain received into such warehouse from any person or source; and no discrimination shall be made, directly or indirectly, for or against any charges made by such warehouseman for the storage of grain.

"The maximum charge of storage and handling of grain, including the cost of receiving and delivering, shall be for the first thirty days or part thereof two cents per bushel, and for each fifteen days or part thereof, after the first thirty days, one-half of one cent per bushel; provided, however, that grain damp or liable to early damage, as indicated by its inspection when received, may be subject to two cents per bushel storage for the first ten days, and for each additional five days or part thereof, not exceeding one-half of one per cent per bushel."

On the twenty-ninth day of June, 1872, an information was filed in the Criminal Court of Cook County, Ill., against Munn & Scott, alleging that they were, on the twenty-eighth day of June, 1872, in the city of Chicago, in said county, the managers and lessees of a public warehouse, known as the "North-western Elevator," in which they then and there stored grain in bulk, and mixed the grain of different owners together in said warehouse; that the warehouse was located in the city of Chicago, which contained more than one hundred thousand inhabitants; that they unlawfully transacted the business of public warehousemen, as aforesaid, without procuring a license from the Circuit Court of said county, permitting them

to transact business as public warehousemen, under the laws of the State.

To this information a plea of not guilty was interposed.

From an agreed statement of facts, made a part of the record, it appears that Munn & Scott leased of the owner, in 1862, the ground occupied by the "North-western Elevator," and erected thereon the grain warehouse or elevator in that year, with their own capital and means; that they ever since carried on, in said elevator, the business of storing and handling grain for hire, for which they charged and received, as a compensation, the rates of storage which had been, from year to year, agreed upon and established by the different elevators and warehouses in the city of Chicago, and published in one or more newspapers printed in said city, in the month of January in each year, as the established rates for the year then next ensuing such publication. On the twenty-eighth day of June, 1872, Munn & Scott were the managers and proprietors of the grain warehouse known as "The North-western Elevator," in Chicago, Ill., wherein grain of different owners was stored in bulk and mixed together; and they then and there carried on the business of receiving, storing, and delivering grain for hire, without having taken a license from the Circuit Court of Cook County, permitting them, as managers, to transact business as public warehousemen, and without having filed with the clerk of the Circuit Court a bond to the people of the State of Illinois, as required by sects. 3 and 4 of the act of April 25, 1871. The city of Chicago then, and for more than two years before, had more than one hundred thousand inhabitants. Munn & Scott had stored and mixed grain of different owners together, only by and with the express consent and permission of such owners, or of the consignee of such grain, they having agreed that the compensation should be the published rates of storage.

Munn & Scott had complied in all respects with said act, except in two particulars: *first*, they had not taken out a license, nor given a bond, as required by sects. 3 and 4; and, *second*, they had charged for storage and handling grain the rates established and published in January, 1872, which were higher than those fixed by sect. 15.

The defendants were found guilty, and fined $100.

The judgment of the Criminal Court of Cook County having been affirmed by the Supreme Court of the State, Munn & Scott sued out this writ, and assign for error: —

1. Sects. 3, 4, 5, and 15 of the statute are unconstitutional and void.

2. Said sections are repugnant to the third clause of sect. 8 of art. 1, and the sixth clause of sect. 9, art. 1, of the Constitution of the United States, and to the Fifth and Fourteenth Amendments.

*Mr. W. C. Goudy,* with whom was *Mr. John N. Jewett,* for the plaintiffs in error.

The plaintiffs in error could not safely take a license and give a bond, as required by sects. 3 and 4 of the act, because they would thereby waive the right to question the validity of the act. Cooley on Const. Lim. 181; *Baker* v. *Braman,* 6 Hill, 511; *Ferguson* v. *Landrum,* 1 Bush (Ky.), 548; *Home Ins. Co.* v. *Security Ins. Co.,* 23 Wis. 171.

1. The third, fourth, fifth, and fifteenth sections of the act, under which the plaintiffs in error were convicted and fined, are repugnant to the third clause, § 8, art. 1, of the Constitution of the United States, which confers upon Congress power to regulate commerce with foreign nations and among the several States. *Ward* v. *Maryland,* 12 Wall. 418; *Case of the State Freight Tax,* 15 id. 232; *Gibbons* v. *Ogden,* 9 Wheat. 1; *Brown* v. *Maryland,* 12 id. 419; *Osborne* v. *Mobile,* 16 Wall. 479; *Woodruff* v. *Parham,* 8 id. 123; *Wilson* v. *Blackbird Creek Marsh Co.,* 2 Pet. 245; *Gilman* v. *Philadelphia,* 3 Wall. 713; *License Cases,* 5 How. 504; *Bartemeyer* v. *Iowa,* 18 Wall. 129; *City of New York* v. *Miln,* 11 Pet. 102.

2. These sections are also repugnant to the sixth clause of sect. 9, art. 1, of the Constitution, which ordains that no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another.

3. They are also repugnant to that part of the first section of art. 14 of the amendments to the Constitution of the United States which ordains that no State shall deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of

the laws: 5 Webster's Works, 487 ; Coke's Inst. 46–50 ; *Murray's Lessee* v. *Hoboken Land and Imp. Co.*, 18 How. 272 ; *Hoke* v. *Henderson*, 4 Dev. (N. C.) 15 ; *Taylor* v. *Porter*, 4 Hill, 146 ; *Wynehamer* v. *People*, 13 N. Y. 393 ; Cooley on Const. Lim. 351 *et seq.* ; *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166 ; *Sinnickson* v. *Johnson*, 2 Harr. (N. J.) 129 ; *Gardner* v. *Newburgh*, 2 Johns. Ch. 162 ; also cases cited in note, 13 Wall. 179 ; *Green* v. *Biddle*, 8 Wheat. 1 ; *Bronson* v. *Kinzie*, 1 How. 311 ; Cooley on Const. Lim. 290 ; *Walker* v. *Whitehead*, 16 Wall. 314 ; *Rowley* v. *Hooker*, 21 Ind. 144 ; *Ogden* v. *Saunders*, 12 Wheat. 259 ; *Willard* v. *Longstreet*, 2 Doug. (Mich.) 172 ; *Gantly's Lessee* v. *Ewing*, 3 How. 707 ; and are not within the limits of the police power of the State: 4 Black. Com. 162 ; Bentham (Edin. ed.), part ix. 157 ; Cooley on Const. Lim. 572, 577 ; *Thorpe* v. *I. & M. Railroad Co.*, 27 Vt. 149 ; *Com.* v. *Alger*, 7 Cush. 84 ; 2 Kent, Com. 340 ; *People* v. *I. & M. Railroad Co.*, 9 Mich. 307 ; *Lake View* v. *Rosehill Cem Co.*, 6 Chicago Legal News, 120 ; *Benson* v. *Mayor*, 10 Barb. 245 ; *Vanderbilt* v. *Adams*, 7 Cow. (N. Y.) 449 ; Broom's Legal Maxims, 357.

They do not regulate the use of property for the future, but deprive the plaintiffs in error of property in existence, and used by them for years prior to the passage of the law. *Wynehamer* v. *People*, 13 N. Y. 378 ; *Com.* v. *Alger*, 7 Cush. (Mass.) 84 ; *Bartemeyer* v. *Iowa*, 18 Wall. 129.

The following authorities are directly in point against the exercise of such power: Cooley on Const. Lim. 393 ; *Doe ex dem. Gaines* v. *Buford*, 1 Dana (Ky.), 490 ; *Webb* v. *Baird*, 6 Ind. 17 ; and the examples of legislation in regard to usury, ferries, mills, hackmen, &c., are not precedents justifying it: 7 Bac. Abr. 188 (ed. 1807) ; Angell on Highways, §§ 47, 48 ; *Birset* v. *Hart*, Willes, 508 ; *Mills* v. *County of St Clair*, 2 Gilm. 197 ; *Dundy* v. *Chambers*, 23 Ill. 369 ; 15 Vin. Abr. 398 ; *Hix* v. *Gardner*, Bulst. 195.

The sections in question are repugnant to the provision of the Fourteenth Amendment, that no State shall deny to any person within its jurisdiction the equal protection of the laws. Cooley on Const. Lim. 391 ; *Walley's Heirs* v. *Kennedy*, 2 Yerg. (Tenn.) 554.

The provisions of the Constitution of Illinois in regard to warehouses do not affect the questions. *Railroad Company* v. *McClure,* 10 Wall. 511; *Home of the Friendless* v. *Rouse,* 8 id. 430; *The Washington University* v. *Rouse,* id. 439.

*Mr. James K. Edsall,* Attorney-General of Illinois, *contra.*

1. The statute is not a regulation of commerce within the purview of the Constitution. *Woodruff* v. *Parham,* 8 Wall. 123; *Hinson* v. *Lott,* id. 148; *Osborne* v. *Mobile,* 16 id. 479; *Nathan* v. *Louisiana,* 8 How. 73; *People* v. *Saratoga & Rens. Railroad Co.,* 15 Wend. 135; *Gibbons* v. *Ogden,* 9 Wheat. 1; *Slaughter-House Cases,* 16 Wall. 36; *Gilman* v. *Philadelphia,* 3 id. 713; *City of New York* v. *Miln,* 11 Pet. 102; *Crandall* v. *State of Nevada,* 6 Wall. 35; *Brown* v. *Maryland,* 12 Wheat. 419; *License Cases,* 5 How. 504.

2. If the statute is in any sense a regulation of inter-state commerce, it belongs to that class of powers which may be exercised by the State in the absence of conflicting congressional legislation. *Cooley* v. *Board of Wardens of the Port of Philadelphia,* 12 How. 299; *Gilman* v. *Philadelphia, supra; Wilson* v. *Blackbird Creek Marsh Co.,* 2 Pet. 245; *Crandall* v. *State of Nevada, supra; License Cases, supra.*

3. The statute is not repugnant to that clause of the Constitution which prohibits giving a " preference to the ports of one State over those of another." That clause imposes a limitation only upon the powers of Congress.

4. The statute does not deprive persons of their property without due process of law. Cooley on Const. Lim. 541; *Slaughter-House Cases, supra; Sharpless* v. *Mayor of Philadelphia,* 27 Pa. St. 166; *Grant* v. *Courter,* 24 Barb. (N. Y.) 232; *Commonwealth* v. *Tewksbury,* 11 Met. 55; *Commonwealth* v. *Alger,* 7 Cush. (Mass.) 84; *Met. Board of Police* v. *Barrett,* 34 N. Y. 667; *Bartemeyer* v. *Iowa,* 18 Wall. 133.

5. Warehousemen for the storage of grain in the manner the business is conducted at Chicago are engaged in a public employment, as distinguished from ordinary business pursuits. In this regard they occupy a position similar to common carriers, who are held to " exercise a sort of public office," and have public duties to perform. *N. J. Steam Nav. Co.* v. *Merchants'*

*Bank*, 6 How. 344; *Sanford* v. *Railroad Company*, 24 Penn. St. 381; *Coggs* v. *Bernard*, 2 Ld. Raym. 909; *C. & N. W. Railroad Co.* v. *The People*, 56 Ill. 377.

Like common carriers, they are required by law to receive grain from all persons, and store the same upon equal terms and conditions. Rev. Stat. of Ill. (of 1874), p. 821, § 101; *Ross* v. *Johnson*, 5 Burr. 2827; *Low* v. *Martin*, 18 Ill. 288; *Steinman* v. *Wilkins*, 7 Watts & S. (Pa.) 466, 468.

Although the ownership of the property is private, the use may be public in a strict, legal sense; hence, in adjudicated cases, the terms " public wharves," " public roads," " public houses," and " public warehouses," are of frequent occurrence, although the property may be the subject of private ownership. *Dutton* v. *Strong*, 1 Black, 32; *Ives* v. *Hartley*, 51 Ill. 523; *Olcott* v. *The Supervisors*, 16 Wall. 678.

6. Whenever any person pursues a public calling, and sustains such relations to the public that the people must of necessity deal with him, and are under a moral duress to submit to his terms if he is unrestrained by law, then, in order to prevent extortion and an abuse of his position, the price he may charge for his services may be regulated by law. *Commonwealth* v. *Duane*, 98 Mass. 1; *State* v. *Perry*, 5 Jones (N. C.) L. 252; *State* v. *Nixon*, id. 258; Bac. Abr. tit. " Carriers," D.; *Murray's Lessee et al.* v. *Hoboken Land and Imp. Co.*, 18 How. 272; *Kirkham* v. *Shawcross*, 6 T. R. 17; 2 Peake N. P. C. 185; 10 M. & W. 415; *Ogden* v. *Saunders*, 12 Wheat. 259; *Mills* v. *County Commissioners*, 4 Ill. 53; *Trustees of Schools* v. *Tatman*, 13 id. 37.

If grain warehousemen in Chicago " pursue a public employment," or " exercise a sort of public office," and sustain such relations to the public that all the grain consigned to " the greatest grain market in the world " must necessarily pass through their hands, the State of Illinois, in virtue of its unquestionable power to regulate its internal commerce, may enact laws prescribing maximum rates of storage. The storage of grain offered for sale in the markets of a State most clearly pertains to its internal or domestic commerce.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

The question to be determined in this case is whether the general assembly of Illinois can, under the limitations upon the legislative power of the States imposed by the Constitution of the United States, fix by law the maximum of charges for the storage of grain in warehouses at Chicago and other places in the State having not less than one hundred thousand inhabitants, "in which grain is stored in bulk, and in which the grain of different owners is mixed together, or in which grain is stored in such a manner that the identity of different lots or parcels cannot be accurately preserved."

It is claimed that such a law is repugnant —

1. To that part of sect. 8, art. 1, of the Constitution of the United States which confers upon Congress the power " to regulate commerce with foreign nations and among the several States ; "

2. To that part of sect. 9 of the same article which provides that " no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another ; " and

3. To that part of amendment 14 which ordains that no State shall " deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

We will consider the last of these objections first.

Every statute is presumed to be constitutional. The courts ought not to declare one to be unconstitutional, unless it is clearly so. If there is doubt, the expressed will of the legislature should be sustained.

The Constitution contains no definition of the word " deprive," as used in the Fourteenth Amendment. To determine its signification, therefore, it is necessary to ascertain the effect which usage has given it, when employed in the same or a like connection.

While this provision of the amendment is new in the Constitution of the United States, as a limitation upon the powers of the States, it is old as a principle of civilized government. It is found in Magna Charta, and, in substance if not in form, in

nearly or quite all the constitutions that have been from time to time adopted by the several States of the Union. By the Fifth Amendment, it was introduced into the Constitution of the United States as a limitation upon the powers of the national government, and by the Fourteenth, as a guaranty against any encroachment upon an acknowledged right of citizenship by the legislatures of the States.

When the people of the United Colonies separated from Great Britain, they changed the form, but not the substance, of their government. They retained for the purposes of government all the powers of the British Parliament, and through their State constitutions, or other forms of social compact, undertook to give practical effect to such as they deemed necessary for the common good and the security of life and property. All the powers which they retained they committed to their respective States, unless in express terms or by implication reserved to themselves. Subsequently, when it was found necessary to establish a national government for national purposes, a part of the powers of the States and of the people of the States was granted to the United States and the people of the United States. This grant operated as a further limitation upon the powers of the States, so that now the governments of the States possess all the powers of the Parliament of England, except such as have been delegated to the United States or reserved by the people. The reservations by the people are shown in the prohibitions of the constitutions.

When one becomes a member of society, he necessarily parts with some rights or privileges which, as an individual not affected by his relations to others, he might retain. "A body politic," as aptly defined in the preamble of the Constitution of Massachusetts, "is a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good." This does not confer power upon the whole people to control rights which are purely and exclusively private, *Thorpe* v. *R. & B. Railroad Co.*, 27 Vt. 143; but it does authorize the establishment of laws requiring each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another. This is the very essence of government, and

has found expression in the maxim *sic utere tuo ut alienum non loedas.* From this source come the police powers, which, as was said by Mr. Chief Justice Taney in the *License Cases,* 5 How. 583, " are nothing more or less than the powers of government inherent in every sovereignty, . . . that is to say, . . . the power to govern men and things." Under these powers the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good. In their exercise it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, &c., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold. To this day, statutes are to be found in many of the States upon some or all these subjects; and we think it has never yet been successfully contended that such legislation came within any of the constitutional prohibitions against interference with private property. With the Fifth Amendment in force, Congress, in 1820, conferred power upon the city of Washington " to regulate . . . the rates of wharfage at private wharves, . . . the sweeping of chimneys, and to fix the rates of fees therefor, . . . and the weight and quality of bread," 3 Stat. 587, sect. 7; and, in 1848, " to make all necessary regulations respecting hackney carriages and the rates of fare of the same, and the rates of hauling by cartmen, wagoners, carmen, and draymen, and the rates of commission of auctioneers," 9 id. 224, sect. 2.

From this it is apparent that, down to the time of the adoption of the Fourteenth Amendment, it was not supposed that statutes regulating the use, or even the price of the use, of private property necessarily deprived an owner of his property without due process of law. Under some circumstances they may, but not under all. The amendment does not change the law in this particular: it simply prevents the States from doing that which will operate as such a deprivation.

This brings us to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what without its operative effect. Look-

ing, then, to the common law, from whence came the right which the Constitution protects, we find that when private property is "affected with a public interest, it ceases to be *juris privati* only." This was said by Lord Chief Justice Hale more than two hundred years ago, in his treatise *De Portibus Maris*, 1 Harg. Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control.

Thus, as to ferries, Lord Hale says, in his treatise *De Jure Maris*, 1 Harg. Law Tracts, 6, the king has "a right of franchise or privilege, that no man may set up a common ferry for all passengers, without a prescription time out of mind, or a charter from the king. He may make a ferry for his own use or the use of his family, but not for the common use of all the king's subjects passing that way; because it doth in consequence tend to a common charge, and is become a thing of public interest and use, and every man for his passage pays a toll, which is a common charge, and every ferry ought to be under a public regulation, viz., that it give attendance at due times, keep a boat in due order, and take but reasonable toll; for if he fail in these he is finable." So if one owns the soil and landing-places on both banks of a stream, he cannot use them for the purposes of a public ferry, except upon such terms and conditions as the body politic may from time to time impose; and this because the common good requires that all public ways shall be under the control of the public authorities. This privilege or prerogative of the king, who in this connection only represents and gives another name to the body politic, is not primarily for his profit, but for the protection of the people and the promotion of the general welfare.

And, again, as to wharves and wharfingers, Lord Hale, in his treatise *De Portibus Maris*, already cited, says : —

" A man, for his own private advantage, may, in a port or town, set up a wharf or crane, and may take what rates he and his customers can agree for cranage, wharfage, housellage, pesage ; for he doth no more than is lawful for any man to do, viz., makes the most of his own. . . . If the king or subject have a public wharf, unto which all persons that come to that port must come and unlade or lade their goods as for the purpose, because they are the wharfs only licensed by the king; . . . or because there is no other wharf in that port, as it may fall out where a port is newly erected ; in that case there cannot be taken arbitrary and excessive duties for cranage, wharfage, pesage, &c., neither can they be enhanced to an immoderate rate ; but the duties must be reasonable and moderate, though settled by the king's license or charter. For now the wharf and crane and other conveniences are affected with a public interest, and they cease to be *juris privati* only ; as if a man set out a street in new building on his own land, it is now no longer bare private interest, but is affected by a public interest."

This statement of the law by Lord Hale was cited with approbation and acted upon by Lord Kenyon at the beginning of the present century, in *Bolt* v. *Stennett*, 8 T. R. 606.

And the same has been held as to warehouses and warehousemen. In *Aldnutt* v. *Inglis*, 12 East, 527, decided in 1810, it appeared that the London Dock Company had built warehouses in which wines were taken in store at such rates of charge as the company and the owners might agree upon. Afterwards the company obtained authority, under the general warehousing act, to receive wines from importers before the duties upon the importation were paid ; and the question was, whether they could charge arbitrary rates for such storage, or must be content with a reasonable compensation. Upon this point Lord Ellenborough said (p. 537) : —

" There is no doubt that the general principle is favored, both in law and justice, that every man may fix what price he pleases upon his own property, or the use of it; but if for a particular purpose the public have a right to resort to his premises and make use of them, and he have a monopoly in them for that purpose, if

he will take the benefit of that monopoly, he must, as an equivalent, perform the duty attached to it on reasonable terms. The question then is, whether, circumstanced as this company is, by the combination of the warehousing act with the act by which they were originally constituted, and with the actually existing state of things in the port of London, whereby they alone have the warehousing of these wines, they be not, according to the doctrine of Lord Hale, obliged to limit themselves to a reasonable compensation for such warehousing. And, according to him, whenever the accident of time casts upon a party the benefit of having a legal monopoly of landing goods in a public port, as where he is the owner of the only wharf authorized to receive goods which happens to be built in a port newly erected, he is confined to take reasonable compensation only for the use of the wharf."

And further on (p. 539) : —

" It is enough that there exists in the place and for the commodity in question a virtual monopoly of the warehousing for this purpose, on which the principle of law attaches, as laid down by Lord Hale in the passage referred to [that from *De Portibus Maris* already quoted], which includes the good sense as well as the law of the subject."

And in the same case Le Blanc, J., said (p. 541) : —

" Then, admitting these warehouses to be private property, and that the company might discontinue this application of them, or that they might have made what terms they pleased in the first instance, yet having, as they now have, this monopoly, the question is, whether the warehouses be not private property clothed with a public right, and, if so, the principle of law attaches upon them. The privilege, then, of bonding these wines being at present confined by the act of Parliament to the company's warehouses, is it not the privilege of the public, and shall not that which is for the good of the public attach on the monopoly, that they shall not be bound to pay an arbitrary but a reasonable rent? But upon this record the company resist having their demand for warehouse rent confined within any limit; and, though it does not follow that the rent in fact fixed by them is unreasonable, they do not choose to insist on its being reasonable for the purpose of raising the question. For this purpose, therefore, the question may be taken to be whether they may claim an unreasonable rent. But though this be private property, yet the principle laid down by Lord Hale attaches

upon it, that when private property is affected with a public interest it ceases to be *juris privati* only ; and, in case of its dedication to such a purpose as this, the owners cannot take arbitrary and excessive duties, but the duties must be reasonable."

We have quoted thus largely the words of these eminent expounders of the common law, because, as we think, we find in them the principle which supports the legislation we are now examining. Of Lord Hale it was once said by a learned American judge, —

" In England, even on rights of prerogative, they scan his words with as much care as if they had been found in Magna Charta ; and the meaning once ascertained, they do not trouble themselves to search any further." 6 Cow. (N. Y.) 536, note.

In later times, the same principle came under consideration in the Supreme Court of Alabama. That court was called upon, in 1841, to decide whether the power granted to the city of Mobile to regulate the weight and price of bread was unconstitutional, and it was contended that " it would interfere with the right of the citizen to pursue his lawful trade or calling in the mode his judgment might dictate ; " but the court said, " there is no motive . . . for this interference on the part of the legislature with the lawful actions of individuals, or the mode in which private property shall be enjoyed, unless such calling affects the public interest, or private property is employed in a manner which directly affects the body of the people. Upon this principle, in this State, tavern-keepers are licensed ; . . . and the County Court is required, at least once a year, to settle the rates of innkeepers. Upon the same principle is founded the control which the legislature has always exercised in the establishment and regulation of mills, ferries, bridges, turnpike roads, and other kindred subjects." *Mobile* v. *Yuille*, 3 Ala. N. s. 140.

From the same source comes the power to regulate the charges of common carriers, which was done in England as long ago as the third year of the reign of William and Mary, and continued until within a comparatively recent period. And in the first statute we find the following suggestive preamble, to wit : —

" And whereas divers wagoners and other carriers, by combination amongst themselves, have raised the prices of carriage of goods in many places to excessive rates, to the great injury of the trade: Be it, therefore, enacted," &c.   3 W. & M. c. 12, § 24; 3 Stat. at Large (Great Britain), 481.

Common carriers exercise a sort of public office, and have duties to perform in which the public is interested.   *New Jersey Nav. Co.* v. *Merchants' Bank*, 6 How. 382.   Their business is, therefore, " affected with a public interest," within the meaning of the doctrine which Lord Hale has so forcibly stated.

But we need not go further.   Enough has already been said to show that, when private property is devoted to a public use, it is subject to public regulation.   It remains only to ascertain whether the warehouses of these plaintiffs in error, and the business which is carried on there, come within the operation of this principle.

For this purpose we accept as true the statements of fact contained in the elaborate brief of one of the counsel of the plaintiffs in error.   From these it appears that " the great producing region of the West and North-west sends its grain by water and rail to Chicago, where the greater part of it is shipped by vessel for transportation to the seaboard by the Great Lakes, and some of it is forwarded by railway to the Eastern ports. . . . Vessels, to some extent, are loaded in the Chicago harbor, and sailed through the St. Lawrence directly to Europe. . . . The quantity [of grain] received in Chicago has made it the greatest grain market in the world. This business has created a demand for means by which the immense quantity of grain can be handled or stored, and these have been found in grain warehouses, which are commonly called elevators, because the grain is elevated from the boat or car, by machinery operated by steam, into the bins prepared for its reception, and elevated from the bins, by a like process, into the vessel or car which is to carry it on. . . . In this way the largest traffic between the citizens of the country north and west of Chicago and the citizens of the country lying on the Atlantic coast north of Washington is in grain which passes through the elevators of Chicago.   In this way the trade in grain is carried on by the inhabitants of seven or eight of the

great States of the West with four or five of the States lying on the sea-shore, and forms the largest part of inter-state commerce in these States.  The grain warehouses or elevators in Chicago are immense structures, holding from 300,000 to 1,000,000 bushels at one time, according to size.  They are divided into bins of large capacity and great strength. . . . They are located with the river harbor on one side and the railway tracks on the other; and the grain is run through them from car to vessel, or boat to car, as may be demanded in the course of business.  It has been found impossible to preserve each owner's grain separate, and this has given rise to a system of inspection and grading, by which the grain of different owners is mixed, and receipts issued for the number of bushels which are negotiable, and redeemable in like kind, upon demand.  This mode of conducting the business was inaugurated more than twenty years ago, and has grown to immense proportions.  The railways have found it impracticable to own such elevators, and public policy forbids the transaction of such business by the carrier; the ownership has, therefore, been by private individuals, who have embarked their capital and devoted their industry to such business as a private pursuit."

In this connection it must also be borne in mind that, although in 1874 there were in Chicago fourteen warehouses adapted to this particular business, and owned by about thirty persons, nine business firms controlled them, and that the prices charged and received for storage were such " as have been from year to year agreed upon and established by the different elevators or warehouses in the city of Chicago, and which rates have been annually published in one or more newspapers printed in said city, in the month of January in each year, as the established rates for the year then next ensuing such publication."  Thus it is apparent that all the elevating facilities through which these vast productions " of seven or eight great States of the West " must pass on the way " to four or five of the States on the seashore " may be a " virtual " monopoly.

Under such circumstances it is difficult to see why, if the common carrier, or the miller, or the ferryman, or the innkeeper, or the wharfinger, or the baker, or the cartman, or the

hackney-coachman, pursues a public employment and exercises "a sort of public office," these plaintiffs in error do not. They stand, to use again the language of their counsel, in the very "gateway of commerce," and take toll from all who pass. Their business most certainly "tends to a common charge, and is become a thing of public interest and use." Every bushel of grain for its passage "pays a toll, which is a common charge," and, therefore, according to Lord Hale, every such warehouse-man "ought to be under public regulation, viz., that he . . . take but reasonable toll." Certainly, if any business can be clothed "with a public interest, and cease to be *juris privati* only," this has been. It may not be made so by the operation of the Constitution of Illinois or this statute, but it is by the facts.

We also are not permitted to overlook the fact that, for some reason, the people of Illinois, when they revised their Constitution in 1870, saw fit to make it the duty of the general assembly to pass laws "for the protection of producers, shippers, and receivers of grain and produce," art. 13, sect. 7; and by sect. 5 of the same article, to require all railroad companies receiving and transporting grain in bulk or otherwise to deliver the same at any elevator to which it might be consigned, that could be reached by any track that was or could be used by such company, and that all railroad companies should permit connections to be made with their tracks, so that any public warehouse, &c., might be reached by the cars on their railroads. This indicates very clearly that during the twenty years in which this peculiar business had been assuming its present "immense proportions," something had occurred which led the whole body of the people to suppose that remedies such as are usually employed to prevent abuses by virtual monopolies might not be inappropriate here. For our purposes we must assume that, if a state of facts could exist that would justify such legislation, it actually did exist when the statute now under consideration was passed. For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the State. But if it could, we must presume it did. Of the propriety of legisla-

tive interference within the scope of legislative power, the legislature is the exclusive judge.

Neither is it a matter of any moment that no precedent can be found for a statute precisely like this. It is conceded that the business is one of recent origin, that its growth has been rapid, and that it is already of great importance. And it must also be conceded that it is a business in which the whole public has a direct and positive interest. It presents, therefore, a case for the application of a long-known and well-established principle in social science, and this statute simply extends the law so as to meet this new development of commercial progress. There is no attempt to compel these owners to grant the public an interest in their property, but to declare their obligations, if they use it in this particular manner.

It matters not in this case that these plaintiffs in error had built their warehouses and established their business before the regulations complained of were adopted. What they did was from the beginning subject to the power of the body politic to require them to conform to such regulations as might be established by the proper authorities for the common good. They entered upon their business and provided themselves with the means to carry it on subject to this condition. If they did not wish to submit themselves to such interference, they should not have clothed the public with an interest in their concerns. The same principle applies to them that does to the proprietor of a hackney-carriage, and as to him it has never been supposed that he was exempt from regulating statutes or ordinances because he had purchased his horses and carriage and established his business before the statute or the ordinance was adopted.

It is insisted, however, that the owner of property is entitled to a reasonable compensation for its use, even though it be clothed with a public interest, and that what is reasonable is a judicial and not a legislative question.

As has already been shown, the practice has been otherwise. In countries where the common law prevails, it has been customary from time immemorial for the legislature to declare what shall be a reasonable compensation under such circumstances, or, perhaps more properly speaking, to fix a maximum beyond which any charge made would be unreason-

able.    Undoubtedly, in mere private contracts, relating to mat-
ters in which the public has no interest, what is reasonable
must be ascertained judicially.    But this is because the legis-
lature has no control over such a contract.    So, too, in matters
which do affect the public interest, and as to which legislative
control may be exercised, if there are no statutory regulations
upon the subject, the courts must determine what is reasonable.
The controlling fact is the power to regulate at all.    If that
exists, the right to establish the maximum of charge, as one of the
means of regulation, is implied.    In fact, the common-law rule,
which requires the charge to be reasonable, is itself a regulation
as to price.    Without it the owner could make his rates at will,
and compel the public to yield to his terms, or forego the use.

But a mere common-law regulation of trade or business may
be changed by statute.    A person has no property, no vested
interest, in any rule of the common law.    That is only one of
the forms of municipal law, and is no more sacred than any
other.    Rights of property which have been created by the
common law cannot be taken away without due process; but
the law itself, as a rule of conduct, may be changed at the will,
or even at the whim, of the legislature, unless prevented by
constitutional limitations.    Indeed, the great office of statutes
is to remedy defects in the common law as they are developed,
and to adapt it to the changes of time and circumstances.    To
limit the rate of charge for services rendered in a public em-
ployment, or for the use of property in which the public has an
interest, is only changing a regulation which existed before.
It establishes no new principle in the law, but only gives a new
effect to an old one.

We know that this is a power which may be abused; but
that is no argument against its existence.    For protection
against abuses by legislatures the people must resort to the polls,
not to the courts.

After what has already been said, it is unnecessary to refer
at length to the effect of the other provision of the Fourteenth
Amendment which is relied upon, viz., that no State shall
"deny to any person within its jurisdiction the equal protec-
tion of the laws."    Certainly, it cannot be claimed that this
prevents the State from regulating the fares of hackmen or the

charges of draymen in Chicago, unless it does the same thing in every other place within its jurisdiction. But, as has been seen, the power to regulate the business of warehouses depends upon the same principle as the power to regulate hackmen and draymen, and what cannot be done in the one case in this particular cannot be done in the other.

We come now to consider the effect upon this statute of the power of Congress to regulate commerce.

It was very properly said in the case of the *State Tax on Railway Gross Receipts*, 15 Wall. 293, that "it is not every thing that affects commerce that amounts to a regulation of it, within the meaning of the Constitution." The warehouses of these plaintiffs in error are situated and their business carried on exclusively within the limits of the State of Illinois. They are used as instruments by those engaged in State as well as those engaged in inter-state commerce, but they are no more necessarily a part of commerce itself than the dray or the cart by which, but for them, grain would be transferred from one railroad station to another. Incidentally they may become connected with inter-state commerce, but not necessarily so. Their regulation is a thing of domestic concern, and, certainly, until Congress acts in reference to their inter-state relations, the State may exercise all the powers of government over them, even though in so doing it may indirectly operate upon commerce outside its immediate jurisdiction. We do not say that a case may not arise in which it will be found that a State, under the form of regulating its own affairs, has encroached upon the exclusive domain of Congress in respect to inter-state commerce, but we do say that, upon the facts as they are represented to us in this record, that has not been done.

The remaining objection, to wit, that the statute in its present form is repugnant to sect. 9, art. 1, of the Constitution of the United States, because it gives preference to the ports of one State over those of another, may be disposed of by the single remark that this provision operates only as a limitation of the powers of Congress, and in no respect affects the States in the regulation of their domestic affairs.

We conclude, therefore, that the statute in question is not repugnant to the Constitution of the United States, and that

there is no error in the judgment. In passing upon this case we have not been unmindful of the vast importance of the questions involved. This and cases of a kindred character were argued before us more than a year ago by most eminent counsel, and in a manner worthy of their well-earned reputations. We have kept the cases long under advisement, in order that their decision might be the result of our mature deliberations.

*Judgment affirmed.*

MR. JUSTICE FIELD and MR. JUSTICE STRONG dissented.

MR. JUSTICE FIELD. I am compelled to dissent from the decision of the court in this case, and from the reasons upon which that decision is founded. The principle upon which the opinion of the majority proceeds is, in my judgment, subversive of the rights of private property, heretofore believed to be protected by constitutional guaranties against legislative interference, and is in conflict with the authorities cited in its support.

The defendants had constructed their warehouse and elevator in 1862 with their own means, upon ground leased by them for that purpose, and from that time until the filing of the information against them had transacted the business of receiving and storing grain for hire. The rates of storage charged by them were annually established by arrangement with the owners of different elevators in Chicago, and were published in the month of January. In 1870 the State of Illinois adopted a new constitution, and by it "all elevators or storehouses where grain or other property is stored for a compensation, whether the property stored be kept separate or not, are declared to be public warehouses."

In April, 1871, the legislature of the State passed an act to regulate these warehouses, thus declared to be public, and the warehousing and inspection of grain, and to give effect to this article of the Constitution. By that act public warehouses, as defined in the Constitution, were divided into three classes, the first of which embraced all warehouses, elevators, or granaries located in cities having not less than one hundred thousand inhabitants, in which grain was stored in bulk, and the grain of different owners was mixed together, or stored in such manner

that the identity of different lots or parcels could not be accurately preserved. To this class the elevator of the defendants belonged. The act prescribed the maximum of charges which the proprietor, lessee, or manager of the warehouse was allowed to make for storage and handling of grain, including the cost of receiving and delivering it, for the first thirty days or any part thereof, and for each succeeding fifteen days or any part thereof; and it required him to procure from the Circuit Court of the county a license to transact business as a public warehouseman, and to give a bond to the people of the State in the penal sum of $10,000 for the faithful performance of his duty as such warehouseman of the first class, and for his full and unreserved compliance with all laws of the State in relation thereto. The license was made revocable by the Circuit Court upon a summary proceeding for any violation of such laws. And a penalty was imposed upon every person transacting business as a public warehouseman of the first class, without first procuring a license, or continuing in such business after his license had been revoked, of not less than $100 or more than $500 for each day on which the business was thus carried on. The court was also authorized to refuse for one year to renew the license, or to grant a new one to any person whose license had been revoked. The maximum of charges prescribed by the act for the receipt and storage of grain was different from that which the defendants had previously charged, and which had been agreed to by the owners of the grain. More extended periods of storage were required of them than they formerly gave for the same charges. What they formerly charged for the first twenty days of storage, the act allowed them to charge only for the first thirty days of storage; and what they formerly charged for each succeeding ten days after the first twenty, the act allowed them to charge only for each succeeding fifteen days after the first thirty. The defendants, deeming that they had a right to use their own property in such manner as they desired, not inconsistent with the equal right of others to a like use, and denying the power of the legislature to fix prices for the use of their property, and their services in connection with it, refused to comply with the act by taking out the license and giving the bond required,

but continued to carry on the business and to charge for receiv-
ing and storing grain such prices as they had been accustomed
to charge, and as had been agreed upon between them and the
owners of the grain.   For thus transacting their business with-
out procuring a license, as required by the act, they were prose-
cuted and fined, and the judgment against them was affirmed
by the Supreme Court of the State.

The question presented, therefore, is one of the greatest im-
portance, — whether it is within the competency of a State to
fix the compensation which an individual may receive for the use
of his own property in his private business, and for his services
in connection with it.

The declaration of the Constitution of 1870, that private
buildings used for private purposes shall be deemed public in-
stitutions, does not make them so.   The receipt and storage of
grain in a building erected by private means for that purpose
does not constitute the building a public warehouse.   There is
no magic in the language, though used by a constitutional con-
vention, which can change a private business into a public one,
or alter the character of the building in which the business is
transacted.   A tailor's or a shoemaker's shop would still retain
its private character, even though the assembled wisdom of the
State should declare, by organic act or legislative ordinance, that
such a place was a public workshop, and that the workmen were
public tailors or public shoemakers.   One might as well at-
tempt to change the nature of colors, by giving them a new
designation.   The defendants were no more public warehouse-
men, as justly observed by counsel, than the merchant who
sells his merchandise to the public is a public merchant, or the
blacksmith who shoes horses for the public is a public black-
smith; and it was a strange notion that by calling them so
they would be brought under legislative control.

The Supreme Court of the State — divided, it is true, by
three to two of its members — has held that this legislation was
a legitimate exercise of State authority over private business;
and the Supreme Court of the United States, two only of its
members dissenting, has decided that there is nothing in the
Constitution of the United States, or its recent amendments,
which impugns its validity.   It is, therefore, with diffidence I
presume to question the soundness of the decision.

The validity of the legislation was, among other grounds, assailed in the State court as being in conflict with that provision of the State Constitution which declares that no person shall be deprived of life, liberty, or property without due process of law, and with that provision of the Fourteenth Amendment of the Federal Constitution which imposes a similar restriction upon the action of the State. The State court held, in substance, that the constitutional provision was not violated so long as the owner was not deprived of the title and possession of his property; and that it did not deny to the legislature the power to make all needful rules and regulations respecting the use and enjoyment of the property, referring, in support of the position, to instances of its action in prescribing the interest on money, in establishing and regulating public ferries and public mills, and fixing the compensation in the shape of tolls, and in delegating power to municipal bodies to regulate the charges of hackmen and draymen, and the weight and price of bread. In this court the legislation was also assailed on the same ground, our jurisdiction arising upon the clause of the Fourteenth Amendment, ordaining that no State shall deprive any person of life, liberty, or property without due process of law. But it would seem from its opinion that the court holds that property loses something of its private character when employed in such a way as to be generally useful. The doctrine declared is that property "becomes clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large;" and from such clothing the right of the legislature is deduced to control the use of the property, and to determine the compensation which the owner may receive for it. When Sir Matthew Hale, and the sages of the law in his day, spoke of property as affected by a public interest, and ceasing from that cause to be *juris privati* solely, that is, ceasing to be held merely in private right, they referred to property dedicated by the owner to public uses, or to property the use of which was granted by the government, or in connection with which special privileges were conferred. Unless the property was thus dedicated, or some right bestowed by the government was held with the property, either by specific grant or by prescription of so long a time as

to imply a grant originally, the property was not affected by any public interest so as to be taken out of the category of property held in private right. But it is not in any such sense that the terms " clothing property with a public interest " are used in this case. From the nature of the business under consideration — the storage of grain — which, in any sense in which the words can be used, is a private business, in which the public are interested only as they are interested in the storage of other products of the soil, or in articles of manufacture, it is clear that the court intended to declare that, whenever one devotes his property to a business which is useful to the public, — " affects the community at large," — the legislature can regulate the compensation which the owner may receive for its use, and for his own services in connection with it. " When, therefore," says the court, " one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control." The building used by the defendants was for the storage of grain : in such storage, says the court, the public has an interest; therefore the defendants, by devoting the building to that storage, have granted the public an interest in that use, and must submit to have their compensation regulated by the legislature.

If this be sound law, if there be no protection, either in the principles upon which our republican government is founded, or in the prohibitions of the Constitution against such invasion of private rights, all property and all business in the State are held at the mercy of a majority of its legislature. The public has no greater interest in the use of buildings for the storage of grain than it has in the use of buildings for the residences of families, nor, indeed, any thing like so great an interest; and, according to the doctrine announced, the legislature may fix the rent of all tenements used for residences, without reference to the cost of their erection. If the owner does not like the rates prescribed, he may cease renting his houses. He has granted to the public, says the court, an interest in the use of the

buildings, and " he may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control." The public is interested in the manufacture of cotton, woollen, and silken fabrics, in the construction of machinery, in the printing and publication of books and periodicals, and in the making of utensils of every variety, useful and ornamental; indeed, there is hardly an enterprise or business engaging the attention and labor of any considerable portion of the community, in which the public has not an interest in the sense in which that term is used by the court in its opinion; and the doctrine which allows the legislature to interfere with and regulate the charges which the owners of property thus employed shall make for its use, that is, the rates at which all these different kinds of business shall be carried on, has never before been asserted, so far as I am aware, by any judicial tribunal in the United States.

The doctrine of the State court, that no one is deprived of his property, within the meaning of the constitutional inhibition, so long as he retains its title and possession, and the doctrine of this court, that, whenever one's property is used in such a manner as to affect the community at large, it becomes by that fact clothed with a public interest, and ceases to be *juris privati* only, appear to me to destroy, for all useful purposes, the efficacy of the constitutional guaranty. All that is beneficial in property arises from its use, and the fruits of that use; and whatever deprives a person of them deprives him of all that is desirable or valuable in the title and possession. If the constitutional guaranty extends no further than to prevent a deprivation of title and possession, and allows a deprivation of use, and the fruits of that use, it does not merit the encomiums it has received. Unless I have misread the history of the provision now incorporated into all our State constitutions, and by the Fifth and Fourteenth Amendments into our Federal Constitution, and have misunderstood the interpretation it has received, it is not thus limited in its scope, and thus impotent for good. It has a much more extended operation than either court, State, or Federal has given to it. The provision, it is to be observed, places property under the same protection as life and liberty. Except by due process of law, no State can

deprive any person of either. The provision has been supposed to secure to every individual the essential conditions for the pursuit of happiness; and for that reason has not been heretofore, and should never be, construed in any narrow or restricted sense.

No State " shall deprive any person of life, liberty, or property without due process of law," says the Fourteenth Amendment to the Constitution. By the term " life," as here used, something more is meant than mere animal existence. The inhibition against its deprivation extends to all those limbs and faculties by which life is enjoyed. The provision equally prohibits the mutilation of the body by the amputation of an arm or leg, or the putting out of an eye, or the destruction of any other organ of the body through which the soul communicates with the outer world. The deprivation not only of life, but of whatever God has given to every one with life, for its growth and enjoyment, is prohibited by the provision in question, if its efficacy be not frittered away by judicial decision.

By the term " liberty," as used in the provision, something more is meant than mere freedom from physical restraint or the bounds of a prison. It means freedom to go where one may choose, and to act in such manner, not inconsistent with the equal rights of others, as his judgment may dictate for the promotion of his happiness; that is, to pursue such callings and avocations as may be most suitable to develop his capacities, and give to them their highest enjoyment.

The same liberal construction which is required for the protection of life and liberty, in all particulars in which life and liberty are of any value, should be applied to the protection of private property. If the legislature of a State, under pretence of providing for the public good, or for any other reason, can determine, against the consent of the owner, the uses to which private property shall be devoted, or the prices which the owner shall receive for its uses, it can deprive him of the property as completely as by a special act for its confiscation or destruction. If, for instance, the owner is prohibited from using his building for the purposes for which it was designed, it is of little consequence that he is permitted to retain the

title and possession; or, if he is compelled to take as compensation for its use less than the expenses to which he is subjected by its ownership, he is, for all practical purposes, deprived of the property, as effectually as if the legislature had ordered his forcible dispossession. If it be admitted that the legislature has any control over the compensation, the extent of that compensation becomes a mere matter of legislative discretion. The amount fixed will operate as a partial destruction of the value of the property, if it fall below the amount which the owner would obtain by contract, and, practically, as a complete destruction, if it be less than the cost of retaining its possession. There is, indeed, no protection of any value under the constitutional provision, which does not extend to the use and income of the property, as well as to its title and possession.

This court has heretofore held in many instances that a constitutional provision intended for the protection of rights of private property should be liberally construed. It has so held in the numerous cases where it has been called upon to give effect to the provision prohibiting the States from legislation impairing the obligation of contracts; the provision being construed to secure from direct attack not only the contract itself, but all the essential incidents which give it value and enable its owner to enforce it. Thus, in *Bronson* v. *Kinzie*, reported in the 1st of Howard, it was held that an act of the legislature of Illinois, giving to a mortgagor twelve months within which to redeem his mortgaged property from a judicial sale, and prohibiting its sale for less than two-thirds of its appraised value, was void as applied to mortgages executed prior to its passage. It was contended, in support of the act, that it affected only the remedy of the mortgagee, and did not impair the contract; but the court replied that there was no substantial difference between a retrospective law declaring a particular contract to be abrogated and void, and one which took away all remedy to enforce it, or incumbered the remedy with conditions that rendered it useless or impracticable to pursue it. And, referring to the constitutional provision, the court said, speaking through Mr. Chief Justice Taney, that "it would be unjust to the memory of the distinguished men who framed it, to suppose that it was designed to protect a mere barren and

abstract right, without any practical operation upon the business of life. It was undoubtedly adopted as a part of the Constitution for a great and useful purpose. It was to maintain the integrity of contracts, and to secure their faithful execution throughout this Union, by placing them under the protection of the Constitution of the United States. And it would but ill become this court, under any circumstances, to depart from the plain meaning of the words used, and to sanction a distinction between the right and the remedy, which would render this provision illusive and nugatory, mere words of form, affording no protection and producing no practical result."

And in *Pumpelly* v. *Green Bay Company*, 13 Wall. 177, the language of the court is equally emphatic. That case arose in Wisconsin, the constitution of which declares, like the constitutions of nearly all the States, that private property shall not be taken for public use without just compensation; and this court held that the flooding of one's land by a dam constructed across a river under a law of the State was a taking within the prohibition, and required compensation to be made to the owner of the land thus flooded. The court, speaking through Mr. Justice Miller, said:—

"It would be a very curious and unsatisfactory result, if, in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators, as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that, if the government refrains from the absolute conversion of real property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of the word, it is not *taken* for the public use. Such a construction would pervert the constitutional provision into a restriction on the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors."

The views expressed in these citations, applied to this case, would render the constitutional provision invoked by the defendants effectual to protect them in the uses, income, and revenues of their property, as well as in its title and possession. The construction actually given by the State court and by this court makes the provision, in the language of Taney, a protection to " a mere barren and abstract right, without any practi cal operation upon the business of life," and renders it " illusive and nugatory, mere words of form, affording no protection and producing no practical result."

The power of the State over the property of the citizen under the constitutional guaranty is well defined. The State may take his property for public uses, upon just compensation being made therefor. It may take a portion of his property by way of taxation for the support of the government. It may control the use and possession of his property, so far as may be necessary for the protection of the rights of others, and to secure to them the equal use and enjoyment of their property. The doctrine that each one must so use his own as not to injure his neighbor — *sic utere tuo ut alienum non lædas* — is the rule by which every member of society must possess and enjoy his property; and all legislation essential to secure this common and equal enjoyment is a legitimate exercise of State authority. Except in cases where property may be destroyed to arrest a conflagration or the ravages of pestilence, or be taken under the pressure of an immediate and overwhelming necessity to prevent a public calamity, the power of the State over the property of the citizen does not extend beyond such limits.

It is true that the legislation which secures to all protection in their rights, and the equal use and enjoyment of their property, embraces an almost infinite variety of subjects. Whatever affects the peace, good order, morals, and health of the community, comes within its scope ; and every one must use and enjoy his property subject to the restrictions which such legislation imposes. What is termed the police power of the State, which, from the language often used respecting it, one would suppose to be an undefined and irresponsible element in government, can only interfere with the conduct of individuals in their intercourse with each other, and in the use of their property, so far

as may be required to secure these objects. The compensation which the owners of property, not having any special rights or privileges from the government in connection with it, may demand for its use, or for their own services in union with it, forms no element of consideration in prescribing regulations for that purpose. If one construct a building in a city, the State, or the municipality exercising a delegated power from the State, may require its walls to be of sufficient thickness for the uses intended ; it may forbid the employment of inflammable materials in its construction, so as not to endanger the safety of his neighbors ; if designed as a theatre, church, or public hall, it may prescribe ample means of egress, so as to afford facility for escape in case of accident; it may forbid the storage in it of powder, nitro-glycerine, or other explosive material ; it may require its occupants daily to remove decayed vegetable and animal matter, which would otherwise accumulate and engender disease ; it may exclude from it all occupations and business calculated to disturb the neighborhood or infect the air. Indeed, there is no end of regulations with respect to the use of property which may not be legitimately prescribed, having for their object the peace, good order, safety, and health of the community, thus securing to all the equal enjoyment of their property ; but in establishing these regulations it is evident that compensation to the owner for the use of his property, or for his services in union with it, is not a matter of any importance : whether it be one sum or another does not affect the regulation, either in respect to its utility or mode of enforcement. One may go, in like manner, through the whole round of regulations authorized by legislation, State or municipal, under what is termed the police power, and in no instance will he find that the compensation of the owner for the use of his property has any influence in establishing them. It is only where some right or privilege is conferred by the government or municipality upon the owner, which he can use in connection with his property, or by means of which the use of his property is rendered more valuable to him, or he thereby enjoys an advantage over others, that the compensation to be received by him becomes a legitimate matter of regulation. Submission to the regulation of compensation in such cases is an implied con-

dition of the grant, and the State, in exercising its power of prescribing the compensation, only determines the conditions upon which its concession shall be enjoyed. When the privilege ends, the power of regulation ceases.

Jurists and writers on public law find authority for the exercise of this police power of the State and the numerous regulations which it prescribes in the doctrine already stated, that every one must use and enjoy his property consistently with the rights of others, and the equal use and enjoyment by them of their property. "The police power of the State," says the Supreme Court of Vermont, "extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property in the State. According to the maxim, *sic utere tuo ut alienum non lædas*, which, being of universal application, it must, of course, be within the range of legislative action *to define the mode and manner in which every one may so use his own as not to injure others.*" *Thorpe* v. *Rutland & Burlington Railroad Co.*, 27 Vt. 149. "We think it a settled principle growing out of the nature of well-ordered civil society," says the Supreme Court of Massachusetts, "that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it *shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community.*" *Commonwealth* v. *Alger*, 7 Cush. 84. In his Commentaries, after speaking of the protection afforded by the Constitution to private property, Chancellor Kent says : —

"But though property be thus protected, it is still to be understood that the law-giver has the right to prescribe the mode and manner of using it, *so far as may be necessary to prevent the abuse of the right, to the injury or annoyance of others, or of the public.* The government may, by general regulations, interdict such uses of property as would create nuisances and become dangerous to the lives, or health, or peace, or comfort of the citizens. Unwholesome trades, slaughter-houses, operations offensive to the senses, the deposit of powder, the application of steam-power to propel cars, the building with combustible materials, and the burial of the dead, may all be interdicted by law, in the midst of dense masses of pop-

ulation, *on the general and rational principle that every person ought so to use his property as not to injure his neighbors, and that private interests must be made subservient to the general interests of the community.* 2 Kent, 340.

The Italics in these citations are mine. The citations show what I have already stated to be the case, that the regulations which the State, in the exercise of its police power, authorizes with respect to the use of property are entirely independent of any question of compensation for such use, or for the services of the owner in connection with it.

There is nothing in the character of the business of the defendants as warehousemen which called for the interference complained of in this case. Their buildings are not nuisances; their occupation of receiving and storing grain infringes upon no rights of others, disturbs no neighborhood, infects not the air, and in no respect prevents others from using and enjoying their property as to them may seem best. The legislation in question is nothing less than a bold assertion of absolute power by the State to control at its discretion the property and business of the citizen, and fix the compensation he shall receive. The will of the legislature is made the condition upon which the owner shall receive the fruits of his property and the just reward of his labor, industry, and enterprise. " That government," says Story, " can scarcely be deemed to be free where the rights of property are left solely dependent upon the will of a legislative body without any restraint. The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred." *Wilkeson* v. *Leland,* 2 Pet. 657. The decision of the court in this case gives unrestrained license to legislative will.

The several instances mentioned by counsel in the argument, and by the court in its opinion, in which legislation has fixed the compensation which parties may receive for the use of their property and services, do not militate against the views I have expressed of the power of the State over the property of the citizen. They were mostly cases of public ferries, bridges, and turnpikes, of wharfingers, hackmen, and draymen, and of interest on money. In all these cases, except that of interest on money, which I shall presently notice, there was some special

privilege granted by the State or municipality; and no one, I suppose, has ever contended that the State had not a right to prescribe the conditions upon which such privilege should be enjoyed.  The State in such cases exercises no greater right than an individual may exercise over the use of his own property when leased or loaned to others.  The conditions upon which the privilege shall be enjoyed being stated or implied in the legislation authorizing its grant, no right is, of course, impaired by their enforcement.  The recipient of the privilege, in effect, stipulates to comply with the conditions.  It matters not how limited the privilege conferred, its acceptance implies an assent to the regulation of its use and the compensation for it.  The privilege which the hackman and drayman have to the use of stands on the public streets, not allowed to the ordinary coachman or laborer with teams, constitutes a sufficient warrant for the regulation of their fares.  In the case of the warehousemen of Chicago, no right or privilege is conferred by the government upon them; and hence no assent of theirs can be alleged to justify any interference with their charges for the use of their property.

The quotations from the writings of Sir Matthew Hale, so far from supporting the positions of the court, do not recognize the interference of the government, even to the extent which I have admitted to be legitimate.  They state merely that the franchise of a public ferry belongs to the king, and cannot be used by the subject except by license from him, or prescription time out of mind; and that when the subject has a public wharf by license from the king, or from having dedicated his private wharf to the public, as in the case of a street opened by him through his own land, he must allow the use of the wharf for reasonable and moderate charges.  Thus, in the first quotation which is taken from his treatise *De Jure Maris*, Hale says that the king has " a right of franchise or privilege, that no man may set up a common ferry for all passengers without a prescription time out of mind or a charter from the king.  He may make a ferry for his own use or the use of his family, but not for the common use of all the king's subjects passing that way; because it doth in consequent tend to a common charge, and is become a thing of public interest and use, and every man for his passage

pays a toll, which is a common charge, and every ferry ought to be under a public regulation, viz., that it give attendance at due times, keep a boat in due order, and take but reasonable toll; for if he fail in these he is finable." Of course, one who obtains a license from the king to establish a public ferry, at which " every man for his passage pays a toll," must take it on condition that he charge only reasonable toll, and, indeed, subject to such regulations as the king may prescribe.

In the second quotation, which is taken from his treatise *De Portibus Maris*, Hale says: —

" A man, for his own private advantage, may, in a port or town, set up a wharf or crane, and may take what rates he and his customers can agree for cranage, wharfage, housellage, pesage ; for he doth no more than is lawful for any man to do, viz., makes the most of his own. If the king or subject have a public wharf, unto which all persons that come to that port must come and unlade or lade their goods as for the purpose, because they are the wharves only licensed by the king, or because there is no other wharf in that port, as it may fall out where a port is newly erected, in that case there cannot be taken arbitrary and excessive duties for cranage, wharfage, pesage, &c.; neither can they be enhanced to an immoderate rate, but the duties must be reasonable and moderate, though settled by the king's license or charter. For now the wharf and crane and other conveniences are affected with a public interest, and they cease to be *juris privati* only ; as if a man set out a street in new building on his own land, it is now no longer bare private interest, but is affected by the public interest."

The purport of which is, that if one have a public wharf, by license from the government or his own dedication, he must exact only reasonable compensation for its use. By its dedication to public use, a wharf is as much brought under the common-law rule of subjection to reasonable charges as it would be if originally established or licensed by the crown. All property dedicated to public use by an individual owner, as in the case of land for a park or street, falls at once, by force of the dedication, under the law governing property appropriated by the government for similar purposes.

I do not doubt the justice of the encomiums passed upon Sir

Matthew Hale as a learned jurist of his day; but I am unable to perceive the pertinency of his observations upon public ferries and public wharves, found in his treatises on "The Rights of the Sea" and on "The Ports of the Sea," to the questions presented by the warehousing law of Illinois, undertaking to regulate the compensation received by the owners of private property, when that property is used for private purposes.

The principal authority cited in support of the ruling of the court is that of *Alnutt* v. *Inglis*, decided by the King's Bench, and reported in 12 East. But that case, so far from sustaining the ruling, establishes, in my judgment, the doctrine that every one has a right to charge for his property, or for its use, whatever he pleases, unless he enjoys in connection with it some right or privilege from the government not accorded to others; and even then it only decides what is above stated in the quotations from Sir Matthew Hale, that he must submit, so long as he retains the right or privilege, to reasonable rates. In that case, the London Dock Company, under certain acts of Parliament, possessed the exclusive right of receiving imported goods into their warehouses before the duties were paid; and the question was whether the company was bound to receive them for a reasonable reward, or whether it could arbitrarily fix its compensation. In deciding the case, the Chief Justice, Lord Ellenborough, said:—

"There is no doubt that the general principle is favored, both in law and justice, that every man may fix what price he pleases upon his own property, or the use of it; but if, for a particular purpose, the public have a right to resort to his premises and make use of them, and he have a monopoly in them for that purpose, if he will take the benefit of that monopoly, he must, as an equivalent, perform the duty attached to it on reasonable terms."

And, coming to the conclusion that the company's warehouses were invested with "the monopoly of a public privilege," he held that by law the company must confine itself to take reasonable rates; and added, that if the crown should thereafter think it advisable to extend the privilege more generally to other persons and places, so that the public would not be restrained from exercising a choice of warehouses for the purpose, the company might be enfranchised from the restriction which

attached to a monopoly; but, so long as its warehouses were the only places which could be resorted to for that purpose, the company was bound to let the trade have the use of them for a reasonable hire and reward. The other judges of the court placed their concurrence in the decision upon the ground that the company possessed a legal monopoly of the business, having the only warehouses where goods imported could be lawfully received without previous payment of the duties. From this case it appears that it is only where some privilege in the bestowal of the government is enjoyed in connection with the property, that it is affected with a public interest in any proper sense of the terms. It is the public privilege conferred with the use of the property which creates the public interest in it.

In the case decided by the Supreme Court of Alabama, where a power granted to the city of Mobile to license bakers, and to regulate the weight and price of bread, was sustained so far as regulating the weight of the bread was concerned, no question was made as to the right to regulate the price. 3 Ala. 137. There is no doubt of the competency of the State to prescribe the weight of a loaf of bread, as it may declare what weight shall constitute a pound or a ton. But I deny the power of any legislature under our government to fix the price which one shall receive for his property of any kind. If the power can be exercised as to one article, it may as to all articles, and the prices of every thing, from a calico gown to a city mansion, may be the subject of legislative direction.

Other instances of a similar character may, no doubt, be cited of attempted legislative interference with the rights of property. The act of Congress of 1820, mentioned by the court, is one of them. There Congress undertook to confer upon the city of Washington power to regulate the rates of wharfage at private wharves, and the fees for sweeping chimneys. Until some authoritative adjudication is had upon these and similar provisions, I must adhere, notwithstanding the legislation, to my opinion, that those who own property have the right to fix the compensation at which they will allow its use, and that those who control services have a right to fix the compensation at which they will be rendered. The chimneysweeps may, I think, safely claim all the compensation which

they can obtain by bargain for their work. In the absence of any contract for property or services, the law allows only a reasonable price or compensation; but what is a reasonable price in any case will depend upon a variety of considerations, and is not a matter for legislative determination.

The practice of regulating by legislation the interest receivable for the use of money, when considered with reference to its origin, is only the assertion of a right of the government to control the extent to which a privilege granted by it may be exercised and enjoyed. By the ancient common law it was unlawful to take any money for the use of money: all who did so were called usurers, a term of great reproach, and were exposed to the censure of the church; and if, after the death of a person, it was discovered that he had been a usurer whilst living, his chattels were forfeited to the king, and his lands escheated to the lord of the fee. No action could be maintained on any promise to pay for the use of money, because of the unlawfulness of the contract. Whilst the common law thus condemned all usury, Parliament interfered, and made it lawful to take a limited amount of interest. It was not upon the theory that the legislature could arbitrarily fix the compensation which one could receive for the use of property, which, by the general law, was the subject of hire for compensation, that Parliament acted, but in order to confer a privilege which the common law denied. The reasons which led to this legislation originally have long since ceased to exist; and if the legislation is still persisted in, it is because a long acquiescence in the exercise of a power, especially when it was rightfully assumed in the first instance, is generally received as sufficient evidence of its continued lawfulness. 10 Bac. Abr. 264.*

There were also recognized in England, by the ancient common law, certain privileges as belonging to the lord of the manor, which grew out of the state of the country, the condition of the people, and the relation existing between him and

---

* The statute of 13 Eliz. c. 8, which allows ten per cent interest, recites "that all usury, being forbidden by the law of God, is sin, and detestable;" and the statute of 21 James the First, reducing the rate to eight per cent, provided that nothing in the law should be "construed to allow the practice of usury in point of religion or conscience," — a clause introduced, it is said, to satisfy the bishops, who would not vote for the bill without it.

his tenants under the feudal system. Among these was the right of the lord to compel all the tenants within his manor to grind their corn at his mill. No one, therefore, could set up a mill except by his license, or by the license of the crown, unless he claimed the right by prescription, which presupposed a grant from the lord or crown, and, of course, with such license went the right to regulate the tolls to be received. Woolrych on the Law of Waters, c. 6, of Mills. Hence originated the doctrine which at one time obtained generally in this country, that there could be no mill to grind corn for the public, without a grant or license from the public authorities. It is still, I believe, asserted in some States. This doctrine being recognized, all the rest followed. The right to control the toll accompanied the right to control the establishment of the mill.

It requires no comment to point out the radical differences between the cases of public mills and interest on money, and that of the warehouses in Chicago. No prerogative or privilege of the crown to establish warehouses was ever asserted at the common law. The business of a warehouseman was, at common law, a private business, and is so in its nature. It has no special privileges connected with it, nor did the law ever extend to it any greater protection than it extended to all other private business. No reason can be assigned to justify legislation interfering with the legitimate profits of that business, that would not equally justify an intermeddling with the business of every man in the community, so soon, at least, as his business became generally useful.

I am of opinion that the judgment of the Supreme Court of Illinois should be reversed.

MR. JUSTICE STRONG. When the judgment in this case was announced by direction of a majority of the court, it was well known by all my brethren that I did not concur in it. It had been my purpose to prepare a dissenting opinion, but I found no time for the preparation, and I was reluctant to dissent in such a case without stating my reasons. Mr. Justice Field has now stated them as fully as I can, and I concur in what he has said.