## Case No. 17,726a.

WILLIAMS v. The LIZZIE HENDERSON.[1]

District Court, S. D. Florida. May, 1880.

STATE PILOTAGE LAWS—DISCRIMINATION—CONSTITUTIONALITY.

[A state statute exempting vessels owned wholly in the state from the payment of any pilotage under the existing state laws unless a pilot is actually employed (Act Fla. March 7, 1879) is not a contravention of Rev. St. § 4237, prohibiting the states from discriminating in the rates of pilotage or half pilotage between vessels sailing between ports of the same state and vessels sailing between ports of different states; but such an act is void under the provision of the constitution of the United States that "no preference shall be given by any regulation of commerce or revenue to the ports of one state over those of another state." Article 1, § 9, cl. 6. This latter provision is an inhibition upon the states as well as upon United States.]

[This was a libel for pilotage by C. P. Williams against the steamboat Lizzie Henderson.]

G. Bowne Patterson, for libellant.
L. W. Bethel, for respondent.

LOCKE, District Judge. This is a case wherein a pilot libels for pilotage, under a regulation that gives the first pilot speaking a vessel either entering or leaving port half pilotage. The answer admits the facts alleged in the libel, namely, that the libellant did tender his services as pilot as the vessel was leaving the harbor, bound on a voyage to Havana, but alleges that the vessel is owned wholly within the state of Florida, and therefore exempt from paying any pilotage dues unless a pilot is actually employed, in accordance with an act of the legislature approved March 7, 1879, which provides: "That vessels owned wholly in this state shall not be required to pay any pilotage upon entering or leaving any port in this state, un-

less they avail themselves of the services of a pilot." It is admitted that previous to the passage of this act all vessels were liable to pay pilotage, whether accepting the services of the pilot or not, and the case turns upon the validity of this act. This is claimed by the libellants to be—First, in violation of the provisions of section 4237 of the Revised Statutes, which declares that "no regulations or provisions shall be adopted by any state which shall make any discrimination in the rate of pilotage or half-pilotage between vessels sailing between the ports of one state and vessels sailing between the ports of different states"; second, repugnant to the sixth clause of the ninth section of the first article of the constitution of the United States, which provides that "no preference shall be given by any regulation of commerce or revenue to the ports of one state over those of another"; and, third, that it is a regulation of commerce established by a state, and hence void.

Taking these objections in the order stated, the first relates to the restrictions contained in section 4237 of the Revised Statutes. This plainly divides vessels into two classes,—vessels sailing between the ports of one state, and vessels sailing between the ports of different states; or, in other words, vessels bound from any port to another port in the same state; or those bound to some port in a state other than the one from which they sail,—and declares that between these two classes of vessels there shall be no discrimination. It does not intend to prevent discrimination between individual vessels of either of these classes based upon size, draft of water, or other proper grounds, but evidently is to prohibit any state from so far giving preference to commerce carried on between its own ports as to establish a discrimination between two vessels based upon the fact that one vessel is engaged in a voyage to a port beyond its limits, and the other is not. That this was the intent of the law becomes more apparent when upon examining the pilotage laws in force at the time of the passage of this act, July, 1866, we find that certain states—Massachusetts, Georgia, and perhaps some others—had laws in force embodying this very discrimination in favor of vessels sailing between ports within their own states, and against vessels sailing between such ports and those of other states. The discrimination in the case under consideration is not based upon such state of facts, and I do not therefore consider it in conflict with its provisions.

The two remaining objections may be considered together, because, if the first is valid, the other becomes immaterial. The question as to whether or not pilot laws are regulations of commerce has been so clearly determined by the supreme court that it does not need further consideration, and we take that for granted. Ex parte McNiel, 13 Wall. [80 U. S.] 236; Cooley v. Board of Wardens of Philadelphia, 12 How. [53 U. S.] 299. In

the matter of state legislation as connected with questions of regulations of commerce where congress has not legislated, a long line of decisions has determined, perhaps not directly, but to me satisfactorily, that, from necessity, there have been certain matters upon which the states have properly legislated that have more or less directly affected commerce, and in reality became regulations of commerce, although not originally intended as such. Among these are questions of pilotage, harbor police, quarantine, health, and other like matters, upon which the action of the states has either been directly adopted by congress, as in matters of pilotage and quarantine, or perhaps from an intimate relation to internal regulation. But in all such cases the appropriate limit of state legislation has been its necessity for the benefits of commerce generally, protection against importation of disease, or control of domestic matters; and, whenever such limits have been disregarded, the regulations established in regard to foreign or inter-state commerce have been held to be void as invading the exclusive province of national legislation. Steamship Co. v. Port Wardens, 6 Wall. [73 U. S.] 31; Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1; Foster v. Master and Wardens of Port of New Orleans, 94 U. S. 246; Passenger Cases, 7 How. [48 U. S.] 414; Guy v. City of Baltimore [100 U. S. 434].

The rights of the states to establish pilotage regulations sufficient to insure at their several ports competent pilots, and determine such reasonable fees as will guarantee them compensation, has been recognized both by congress in adopting the regulations in force in 1789, and in adjudications subsequently; but the ground of such recognition and approval has been "the necessity of conforming regulations of pilotage to the local peculiarities of each port," and, when that necessity is satisfied, any further interference with commerce is as liable to objection as any other commercial regulation. The history of the restrictions placed upon states by the provisions of the constitution relating to commercial regulations shows too plainly to be misunderstood their object and intent. As early as 1778, the state of New Jersey pressed upon the attention of congress a memorial upon the subject; and in 1781 Dr. Witherspoon presented a resolution declaring it indispensably necessary that the United States, in congress assembled, should be vested with a right of superintending the commercial regulations of every state, that none might take place which should be partial or contrary to the common interest.

This question, namely, that of the national government having exclusive control of commercial regulations, had an important influence in replacing the articles of confederation by the present constitution. In Rhode Island it caused a delay of two and a half years in its adoption, and was thoroughly discussed and considered in all its bearings, and has been frequently adjudicated since. The supreme court, in the case Veazi v. Moor, 14 How. [55 U. S.] 568, says: "The design and object of that power as evinced in the history of the constitution was to establish a perfect equality among the several states as to commercial rights, and to prevent unjust and invidious distinctions which local and partial interests might be disposed to introduce and maintain." Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1; Brown v. Maryland, 12 Wheat. [25 U. S.] 419; New York v. Miln, 11 Pet. [36 U. S.] 102; License Cases, 5 How. [46 U. S.] 504. These decisions show conclusively how the supreme court has considered the intention and design of the framers of the constitution in this matter, namely, that there should be perfect equality, and no partial laws founded upon local greed or favoritism in commercial matters; but has such intention and design been so declared as to be prohibitory upon the states?

The clause of the constitution cited, namely, the sixth clause of the ninth section of article 1, it is claimed, has this effect. It provides that "no preference shall be given to the ports of one state over those of another," and has been frequently commented upon in judicial decisions, and held to be not a limitation upon the power of congress alone in regulating commerce, for the purpose of producing entire commercial equality between states, but also a prohibition upon each state to destroy such equality. In Passenger Cases, 7 How. [48 U. S.] 414, Mr. Justice Wayne says: "The sixth clause of the ninth section of the first article of the constitution, which declares that no 'preference shall be given by any regulation of commerce or revenue to the ports of one state over those of another state,' is a limitation upon the powers of congress to regulate commerce for the purpose of producing entire commercial equality within the United States, and also a prohibition upon the states to destroy such equality by any legislation prescribing a condition upon which vessels bound from one state shall enter the ports of another." Again he says: "But I return to those clauses with which I have said the act in question is in conflict. It will be conceded by all that the fifth clause of the ninth section of the first article of the constitution was intended to establish among them a perfect equality in navigation. That all should be alike in respect to commerce and navigation is an enjoined constitutional equality which can neither be interrupted by congress nor by the state." The court, in Inman S. S. Co. v. Tinker, 94 U. S. 245, says: "The commerce clauses of the constitution had their origin in a wise and salutary policy. They give to congress the entire control of the foreign and interstate commerce of the country. They were intended to secure harmony and uniformity in the regulations by which they should be governed. Wherever such harmony goes, the power of the nation accompanies it, ready and competent, as far as pos-

sible, to promote its prosperity, and redress the wrongs and evils to which it may be subjected." In Ward v. Maryland, 12 Wall. [79 U. S.] 431, the court says: "Inequality of burden, as well as want of uniformity in commercial regulations, was one of the grievances of the citizens under the confederation; and the new constitution was adopted, among other things, to remedy those defects in the prior system. Evidence to show that the framers of the constitution intended to remove those great evils in the government is found in every one of the sections referred to, and also in the clause which provides that no preference shall be given by any regulation of commerce or revenue to the ports of one state over those of another, showing that congress, as well as the states, is forbidden to make any discrimination in enacting commercial or revenue regulations."

Wherever the idea has been expressed that this clause is not a prohibition upon the states, it has been in connection with the idea of internal commerce or domestic affairs. Cooley v. Port Wardens, 12 How. [53 U. S.] 299; Munn v. Illinois, 94 U. S. 113. In Cooley v. Port Wardens [supra] it was cited, and, instead of .dismissing it as not applying to any action of the state, the court considered it at length, and decided that the special act in question did not make the discrimination prohibited. Had that act exempted all vessels owned in Pennsylvania from paying pilotage, and compelled those owned elsewhere to pay it, the language of that decision satisfies me that the conclusion would have been different. Indeed, it seems but reasonable that if, "when congress sleeps upon its post, the state may seize its armor and exercise its authority," as is expressed in Cribb v. State,. 9 Fla. 409, the same prohibitions which would affect congress on account of the subject-matter of legislation should cling to it, and restrain the states in their action. Were this a local regulation relating alone to the government of pilots, the objection to the application of this principle might be entitled to greater weight; but it is a regulation, in this case relating directly to foreign commerce, and is in no way intended to promote the efficiency or welfare of the pilots, control or regulate them, or provide for their support, neither to protect commerce at large nor provide for its necessities; but its whole object and aim is to make a discrimination in favor of vessels owned by citizens of this state, against all others. That is the entire gist and substance of the enactment.

Preference can only be given the ports of a state by giving advantages to those engaged in doing business through such ports. It is not the port, but the commercial transactions carried on by or through its medium, that are to be given the benefit of such relations. Neither is it the individual port that is not to be preferred, but the state or its citizens through its ports. Nor do I understand that such preference must be confined to vessels entering or leaving such ports, clearing from or being bound to them, any more than being owned and being registered at them, to justify an application of this prohibition. All are protected from being placed in any less favorable position in any commercial transaction on account of the ports of any state through which their business is done than those whose relations are with a port of a different state. Vessels are recognized and known as belonging to certain ports according to the residence of the principal owner, and any preference shown them, or any unequal burden imposed upon them on account of the state in which they are owned, is certainly showing a preference for the ports of the more favored state, whether expressed in so many words or not,—the effect is the same. Had the statute exempted all vessels arriving from or bound to Texas, and compelled payment from those arriving from or bound to Louisiana, can there be any question but what preference has been given to the ports of one state over those of another, although ports may not have been mentioned? And does not this hold equally as good if the difference is on account of the state where the vessel is owned? I consider it does. I am satisfied that if congress should declare all vessels owned within the state of New York might enter and leave any port without the payment of fees, pilotage or of any other character, while others owned elsewhere should be compelled to such payment, then this clause could be justly interposed as prohibitory; and I consider that the same restriction rests upon the legislation of a state relating to foreign commerce as in the present question. A state cannot do indirectly what it is prohibited from doing directly.

The constitution of the United States, and the powers confided by it to the general government, to be exercised for the benefit of all the states, ought not to be nullified or evaded by astute verbal criticisms, without regard to the grand aim and object of the instrument, and the principles on which it is based. Passenger Cases. 7 How. [48 U. S.] 414. The amount involved in the case at bar is small, but the principle of discrimination, if justified, would not be of slight importance to those interested. To a line of vessels carrying the mail between Cedar Keys and Havana, as contemplated by the post-office department, twice a week, it would in the course of a year amount in half pilotages at· this port alone to $4,368, in favor of owners resident within this state; and, if the same regulation should be enforced at Cedar Keys and other places where the vessels might touch, it would be indefinitely increased. If such discrimination might be legally made in matters of pilotage, it might with equal propriety be established in quarantine. port wardens, harbor masters, wharfage and dockage dues, until the people of any state having no pecuniary interest in keeping such burdens, which must to a certain extent rest upon

commerce, within reasonable bounds, might drive all vessels owned elsewhere from its ports and monopolize the entire commerce. If one state might make such discrimination, all might with equal propriety, and the citizens of inland states be, not theoretically, but practically, prohibited from engaging in foreign commerce; and we should soon see local greed and avarice destroy all that has been accomplished by the long line of commercial regulations, based upon the principle of equality of the states in such matters.

But it has been asked, if the discrimination is against vessels owned in other states, why not relieve them of such burden and place them upon an equal footing with the more favored state, relieving all vessels of compulsory pilotage? It is not for courts to decide what the law should be, but what it is; and the only question under consideration is whether the act of 1879 is valid or not. If not, it has not been claimed but what the pilot laws in force prior to the passage of that act were valid and binding, and, if it is invalid, they are still in force. And this I consider to be the case. The amendment of 1879 in no way changed the pilotage laws, as it, in effect, only attempted to establish a discrimination which I consider to be contrary to the spirit and letter of the constitution, hence invalid; and the pilotage is due under pre-existing regulations, and decree will follow accordingly.

Vide [U. S. v. Dickson] 15 Pet. [40 U. S.] 165.