The People ex rel. Samuel H. McCrea

v.

The Soldiers' Home & The Baptist Theological Union.

*Filed at Ottawa June 16, 1880.*

Taxation—*exemption by charter binding on State.* Where the property of a corporation is exempted from taxation by its charter, the exemption amounts to a legislative contract, which is binding on the State, and such property can not afterwards be subjected to taxation.

APPEAL from the County Court of Cook county; the Hon. Mason B. Loomis, Judge, presiding.

Mr. Francis Adams, for the appellant:

The 7th section of the charter of the Baptist Theological Union provides that "the property, real and personal, belonging to such corporation at any and all times hereafter, shall be free and exempt from all taxation and assessments, special or general, for any and all purposes whatever." Vol. 1 Priv. Laws 1865, p. 38.

The General Assembly shall provide for levying a tax by valuation so that *every* person and corporation shall pay a tax in proportion to the value of his or her property. Const. of 1870, art. 9, sec. 2.

The only exception to the limitation by this clause is in section 3 of the same article, which is: "The property of the State and counties, both real and personal, and such other property as the General Assembly *may deem necessary* for school, religious and charitable purposes, may be exempted from taxation." See *Northwestern University* v. *The People, etc.* 80 Ill. 335.

The case cited decides that the power to determine the amount of property which shall be exempt from taxation is conferred by the constitution on the General Assembly, and there is nothing in the opinion of the Supreme Court of the United States which conflicts in the slightest degree with this

36—95 Ill.

decision.   That case also holds that exemption from taxation must be strictly construed.

Mr. CONSIDER H. WILLETT, also for the appellant:

This case can and should be distinguished from that of the *Northwestern University* v. *The People,* decided by the Supreme Court of the United States.

If it be conceded that the charters create a contract of exemption, yet it can not be denied that such contracts seek to tie up the hands of future legislatures and destroy rights which the constitution vests in every successive legislative body.   It is an attempt to destroy legislative power, and not the proper exercise of a delegated power.

In the *Northwestern University cases* the legislature did seek to exercise its discretion in ascertaining the property deemed necessary for school purposes, and limited the amount to 2000 acres; but in the case at bar the amount is unlimited, and no such action was taken by the legislature as the constitution of 1848 contemplated.

The provision of the constitution of 1848 is worded as follows: "The property of the State and counties, both real and personal, and such other property as the General Assembly may deem necessary for schools, religious and charitable purposes, may be exempt from taxation."

If the charters are sustained as exemption contracts it is possible for them to require every acre of land in the State of Illinois to meet their requisitions.

If the whole State is not swallowed up by exemptions from taxation, many villages, cities and townships can be.   Such confiscation in the name of charity can not be sustained.

Mr. JOHN P. WILSON, for the appellees.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

This is an appeal from a judgment holding certain property of appellees exempt from taxation, under the provisions of their respective charters.

The question involved in this case was passed upon by this court, in the case of *Northwestern University* v. *The People*, 86 Ill. 141. That case was taken to the Supreme Court of the United States, where the judgment of this court was reversed. It was there held that the exemption from taxation was by the legislative power, in the charter, and was binding as a contract.

Following the ruling of that court, we think the judgment of the county court was right, and that by the respective charters of appellees, the property in question is not subject to taxation.

*Judgment affirmed.*

SCOTT, J.: I do not concur in the opinion of the majority of the court.

Mr. CHIEF JUSTICE WALKER, dissenting:

The immediate and ultimate importance of the questions involved in this case, I think, justifies me in giving some of the reasons which impel me to dissent from the conclusions reached by the majority of the court.

A rule of construction, never questioned, and, I believe, of uniform application, requires all grants by the State to be liberally construed in its favor, and strictly against the grantee. This rule, I think, has been overlooked in deciding this case. Its application is required in all grants, whether to individuals or corporate bodies. In this, reason and principle imperatively require that no distinction should be made, and this, too, whether the grant be of property, the exercise of power, or of exemptions from the performance of duties or the rendition of services to the public.

When the General Assembly endeavors to grant any of the attributes of government or to disarm itself of power necessary to be employed for the public welfare, even if such grants can be sanctioned by the constitution, they should never be favored by construction. That body is unable to disarm

itself of the power confided to it to be exercised for the general good. Our institutions are based upon the principle of equal rights and equal burthens to all, and any departure from the principle inflicts wrong on some one. The General Assembly is only entrusted with power that it may be retained and exercised for the public good, and not that it may disarm itself by trafficking it away beyond recall. If it may thus deprive itself of one portion of its power, it may, for the same reason, part with all, and subvert the government.

Can it be possible that it can permanently grant away the law-making power? Can it grant that power to others? Can it, for a real or fictitious consideration, exempt all persons and corporate bodies from contributing revenue to the support of government? And if it is powerless to make such a grant of the whole, on what principle, it may be asked, can it grant a part? If the one may be done and the other not, where is the rule that justifies the one and condemns the other? I am clearly of opinion that there is no rule or principle in reason or justice that can sanction such exemptions.

I have never met with a clearer or more forcible enunciation of these principles than in the case of *Tucker* v. *Furguson*, 22 Wall. 375. That was, like this case, a question of the power of a State to cede the taxing power. It was there said: "The taxing power is vital to the functions of government. It helps to support the social compact and give it efficacy. It reaches every member of the community. It may be restrained by contract, in special cases, for the public good, when such contracts are not forbidden, but the contract must be shown to exist. There are no presumptions in its favor. Every reasonable doubt should be resolved against it. Where it exists, it must be rigidly scrutinized, and never permitted to extend in scope or duration beyond what the terms of the concession clearly require. It is in derogation of public right and narrows a trust created for the good of all." This fully and justly recognizes and announces the rule of construction

and the principles which, I think, should govern this case, beyond all question.

If it be said that it is on the principle of commutation, it may be answered that experience has shown such arrangements almost invariably prove unjust to the State and to the owners of other property. Under the constitution of 1848, it was held, whether properly or not, that such commutations were sanctioned, but proving to be pernicious to the public interest, our present constitution has prohibited them in every form. When one person, by fraud or otherwise, escapes his just proportion of a common burthen, he inflicts a wrong on those upon whom he unfairly imposes it. When borne by the many, the burthen may seem trifling to each individual, but it is nevertheless an injustice and a violation of principle. When exemptions are for large sums, and to great numbers, the wrong becomes flagrant, and appreciated and felt by the entire community.

In this State, as it may be in others, there are large numbers of bodies that are claiming privileges and exemptions of this and almost every other character. The last half century has been prolific in the grant of charters for almost every conceivable purpose, and nearly all with special exemptions of this or some other character. It seems that it was only necessary for a few individuals to unite in asking, and our General Assemblies would grant almost any privilege by charter, accompanied with any exemption desired. The mania for granting charters had become so great that the power in some States had to be restrained by constitutional limitation. Otherwise the functions of government and its principles would have been, if they were not already, seriously impaired.

The constitution of 1848, like our present one, required all property in the State, of every description, to be assessed for taxation for revenue purposes. This was required to be done on a valuation, so that every person and corporation should pay a tax in proportion to the value of his, her or its property. This was the great, broad and just principle that was adopted

as the foundation upon which all who were protected by the broad shield of government should contribute to its support. No principle fairer or more just could have been devised, and every principle of justice and policy requires that it should be fairly and honestly carried into effect.     But the rule thus adopted was modified by another provision, which exempts the property of the State and counties, and authorizes the General Assembly to exempt such other property as they might deem necessary for school, religious or charitable purposes.     Had it not been for this latter provision, the General Assembly would have been powerless to exempt any property of any description or for any purpose.     I am unable to believe that the framers of this provision contemplated or intended to destroy and overturn the principle of uniformity they had deliberately adopted in the next preceding section, by enabling the General Assembly to exempt all, or even large portions of property, from its just and fair proportion of the burthens of government.     This would have been to destroy the limitation on the power of the General Assembly imposed by the second section.     This would be to require uniformity and equality of burthen to be imposed on all property by one section, and in the next to authorize the General Assembly to exempt vast and unlimited amounts from taxation.     Is it possible that such a body of men could have contemplated or intended to so act?—To prevent by one clause all exemptions, and by the next to authorize unlimited exemptions as to any number of corporate bodies, and as to any amount in value and articles of property.     We surely should not attribute such inconsistent purposes to such a body of men.

The entire revenue article of that instrument considered, as well as the language of the third section, I am irresistibly impelled to the conclusion that a fair construction clearly prohibits the General Assembly from exempting the real estate of such bodies from taxation beyond what is necessary to enable them to carry into effect the objects for which they were created,—only so much property as might be necessary

to be used and occupied for the buildings and other direct appliances for the purposes of the organization. I can not believe the framers of that instrument ever conceived the idea that churches or charitable bodies would ever desire to become great landed proprietors, and engage in the pursuit of agriculture, buying and selling stock, or leasing lands to, it may be, hundreds of tenants and dependents. They could only have supposed that they were conferring power to exempt the real estate and personalty necessary to be used for the purposes of the organization. They limited it to the necessary property, and thereby excluded property merely useful or profitable. Had they intended that such property as might be useful could be exempted, why not have said necessary and useful property. It was not done, because it was not intended to destroy the limitation contained in the second section.

If I am correct in this construction of these clauses of the fundamental law, and I do not doubt it is the true meaning, then it does not matter what amount of property the General Assembly intended to exempt in granting these charters, as all they exempted, beyond the property necessary for the corporations to use in carrying out the purposes of their charters, was unauthorized and void. In this I but give the construction adopted by these corporations themselves, as they have never claimed exemption from taxes on this property before the present levy, and it seems to me that it requires no strained construction of the language, to "purchase, hold and convey real estate," as used in the charters, to hold it means, and was only intended to mean, the necessary property, and not that which was useful to these bodies. It is manifest to my mind that it requires a strained and highly artificial construction to hold that this authorized the purchase and sale of an unlimited amount of real estate. As well say it authorized these bodies to become real estate brokers, and to buy and sell real estate, because it would be useful and profitable to them. Or, to engage in mercantile business, the buying and selling of grain on 'change, the buying and shipping of stock

and produce, because they are empowered to buy and sell personal property. There must be a limit, and where more naturally than the real and personal property that is reasonably indispensable in carrying out the purposes for which their charters were granted?

The obligation clause in the Federal constitution will, I am fully persuaded, be, from necessity, further limited or modified in its application and scope. In the "granger" cases, as they are denominated, the case of *Dartmouth College* v. *Woodward,* 4 Wheat, 526, and subsequent cases, were held not to embrace and govern them. The comprehensive and far reaching rule, as contended for by some persons, must, I think, from overpowering necessity, if for no other reason, be limited by cases pressing for a modification. In this case, no more liberal construction in favor of the State is required than was given in the case of *Munn* v. *The People,* 94 U. S. 113. Whilst this, in its ultimate results, will, I am fully persuaded, prove as important to the State as that, I believe these attempted grants and exemptions should, for the same reason which operated in those cases, be excluded from the obligation clause of the Federal constitution.

But it is urged that the Supreme Court of the United States has given a different construction to this clause of the constitution, in the case of *Northwestern University* v. *The People,* 9 Otto, 309, appealed from this court. In the organization of our system of government the Federal courts were created to expound and enforce the Federal constitution and laws, and the State courts to interpret and enforce the State constitutions and laws. The Federal Supreme Court has no power to give an authoritative construction of the organic law of a State, nor the court of last resort in a State such an interpretation of the Federal constitution; nor have the courts of one State the power to authoritatively expound the constitutions and laws of another State. The judges of the Supreme Court of the United States take no oath to support the constitution of the States, but the State judges take an oath to support both

the constitution of the Federal government and that of their own State, and the judicial history of the country shows that in the past, with perhaps one or two exceptions, the State tribunals have been true to their obligation to the Federal constitution as expounded by the Supreme Court, and the presumption is they will yield obedience so long as that tribunal shall confine itself to the true domain of its jurisdiction.

We, in the case of *Northwestern University* v. *The People*, 80 Ill. 333, gave a construction to this clause of our constitution, by which these bodies never acquired the exemptions claimed, and if that exposition was correct, there can be no violation of the obligation of any contract. To render that decision violative of a contract an opposite construction had to be given. We, it strikes me, were, in that case, acting fully within the scope of our constitutional authority. I fail to comprehend in what we transcended our legitimate powers. My sense of obligation to the Federal and State constitutions compels me to adhere to our construction of this clause.

It may be said that the amount involved is not important. This may be true, yet the question may, in the future, assume great importance to the State and to the people. All persons in the profession know that at one time, in England, corporations absorbed and became the owners of such vast portions of the lands as to embarrass the government and the people. The inconvenience became so great as to compel their suppression, the distribution of their property, and the passage of laws to prevent the recurrence of the evil, and thus freeing the people to progress in trade and civilization. And the history of the same period shows that those corporate bodies struggled to evade the force of these laws, and in doing so introduced into the law of tenures, uses, trusts, and most of the artificial and intricate rules that have perplexed the bench and bar to the present time. What has occurred in the past has a tendency to occur in the future, when the great inducements of these exemptions are ever prompting these bodies to invest their means in real estate.

Nor should it be forgotten that these and many other organizations, claiming similar privileges and exemptions, have charters conferring perpetual existence. And if it is held that their power to acquire and hold real estate is unlimited, and when thus acquired it is free from taxation, the day may and is almost sure to come when the State must be embarrassed and the people greatly wronged, and this, too, by a most liberal construction in favor of grantees, and contrary to the well and uniformly recognized canon of interpretation. In the short period those bodies have been organized we find they hold property the taxes on which, being resisted, amount to more than three thousand dollars. In view of this fact, who can say what they will amount to in a century, which is but a short period in the life of a nation? Surely, no strained construction should be adopted that may produce such results, and perpetually fasten such results on the State.

I am therefore fully convinced, considerations of justice, the urgent demands of public policy, the principles upon which our revenue policy is based, the language of the third section of the constitution, and the rules of interpretation, all require that this judgment should be reversed. Nor have I been able to perceive a single reason why it should be affirmed.

But aside from all this, in reference to the Soldiers' Home I am unable to hold, even if the exemption was valid, that its property is exempt. The secretary testifies that the Home has been sold, and the corporation has no "soldiers' home;" that it is now occupied as a school for girls. The company, however, owns other real estate that is leased, and the rents thus received, he says, are used in procuring employment for soldiers, and in sending them to other institutions, and in educating the children of disabled soldiers. There is no treasurer who has given bond for the safe-keeping of the money, as required by the charter. The management of its affairs is not under the control of directors, nor is the money appropriated or paid under their control or direction, but it is under the management of a person called a president and

another called a secretary. Whether the money is properly or improperly applied, or is perverted, does not appear, but it is clear that it is not done by the directors, and is illegally appropriated. The law contemplates that the money shall be expended by the directors, and not by one or two individuals. It is, I think, a fair inference, that the purposes of the organization have been accomplished, the organization abandoned and its charter privileges become useless.

I am, for these and other reasons, unable to concur in the conclusions reached by the majority of the court.

Scott and Mulkey, JJ.: We concur in the reasoning and conclusion of Mr. Chief Justice Walker in his dissenting opinion.