RARITAN RIVER RAILROAD COMPANY, DEFENDANT IN ERROR, v. MIDDLESEX AND SOMERSET TRACTION COMPANY, PLAINTIFF IN ERROR.

Argued November 18, 1903—Decided June 20, 1904.

1. A railroad company incorporated under the General Railroad law of 1873 (*Gen. Stat.*, *p.* 2638), was maintaining certain bridges whereby the highway was carried over its tracks at an elevation, the duty to maintain the bridges being imposed upon the railroad company in behalf of the public by statute. *Pamph. L.* 1891, *p.* 161; *Gen. Stat.*, *p.* 2661. A traction company proposed to construct a line of tracks along the highway, and to that end desired to strengthen and reinforce the bridges so that they would sustain the increased weight of traffic placed upon them by reason of the maintenance and operation of the traction road. By agreement between the railroad company and the traction company, the former gave consent that the latter might strengthen and reinforce the bridges, and the parties agreed thereafter to share equally the cost of their maintenance and repair, the traction company being given the right to repair the bridges on default of the railroad company to do so, the railroad company agreeing to pay one-half the cost thereby incurred. *Held*, that

this consent and agreement of the railroad company furnished a valuable consideration to support reciprocal covenants on the part of the traction company.

2. An agreement made between a railroad company and a traction company, whereby the former gives consent that the latter may construct a traction road across the line of the railroad at grade, and settling as between these parties the mode of crossing, is not void because made without application to the Chancellor to define the mode of crossing under the statute. *Pamph. L.* 1895, *p.* 462; *Gen. Stat., p.* 2717.

3. The prohibition of the act regulating the crossing of steam railroads by steam or electric railroads thereafter to be constructed (*Pamph. L.* 1895, *p.* 462; *Gen. Stat., p.* 2717), is intended for the benefit of the parties named in it; the railroad company, the traction company and the municipal authorities being made by the act the representatives of different public interests.

4. Section 15 of the General Railroad law of 1873 (*Gen. Stat., p.* 2643) vests in the railroad company an uncontrolled discretion to establish such rates of freight and fare as its own interests may from time to time require, subject only to the maximum rates prescribed by the section, and to the reserved right of repealer and modification by the legislature.

5. The courts have no general supervisory jurisdiction over the question of freight and passenger rates.

6. An agreement made between a railroad company and a competitor, that during a limited period the former company "will not reduce its present rates of fare unless required by law," is not contrary to public policy as established in this state.

On error to the Supreme Court.

For the plaintiff in error, *Robert H. McCarter,* attorney-general, and *Willard P. Voorhees.*

For the defendant in error, *Charles L. Corbin.*

The opinion of the court was delivered by

PITNEY, J. This writ of error brings under review a judgment of the Supreme Court in favor of the defendant in error (plaintiff below), based upon findings of law and fact by Mr. Justice Collins, before whom the cause was tried without a jury. The action was based upon one of the stipulations of a tripartite agreement, dated September 17th, 1895, made between the Raritan River Railroad Company,

of the first part; the New Brunswick City Railway Company, of the second part, and the Brunswick Traction Company, of the third part. The stipulation in question was made by the latter company. That company was subsequently merged into the Middlesex and Somerset Traction Company, the present defendant, and by a subsequent agreement made between it and the plaintiff, dated June 1st, 1900, the defendant undertook to perform all the covenants and agreements of the Brunswick Traction Company contained in the tripartite agreement. The latter instrument has a dual aspect, some of its stipulations being made between the railroad company and the New Brunswick City Railway Company, and the remaining stipulations being made between the railroad company and the Brunswick Traction Company. The connection of the New Brunswick City Railway Company with the transaction needs no particular mention, since the clauses that relate to it would throw no useful light upon the questions to be discussed.

The Raritan River Railroad Company was incorporated in the year 1888, under the provisions of the General Railroad law of 1873. *Gen. Stat., p.* 2638. The Brunswick Traction Company was organized under the General Traction act of 1893. *Gen. Stat., p.* 3235. From the recitals of the tripartite agreement, and from the findings of the trial justice, it appears that the railroad company owned and was operating a steam railway in the county of Middlesex, extending from New Brunswick to South Amboy, crossing a number of streets and highways at grade, and was maintaining a number of bridges, by means whereof certain highways were carried across its tracks at an elevation; that the traction company was about to construct a street railroad, operated by the trolley system, extending along the highway from New Brunswick to South Amboy, crossing the steam railroad at various points, some at grade and others above grade, and proposed to use the bridges of the railroad company for the latter purpose, and that the agreement was made for the purpose of avoiding litigation and in order to estab-

lish the respective rights of the parties. It provided that the traction company should strengthen and reinforce two bridges that had been constructed by the railroad company for highway crossings, so that the bridges would carry and sustain the increased weight and traffic placed upon them by reason of the maintenance and operation of the trolley railroad. The railroad company agreed thereafter to keep the bridges in repair, and the traction company to pay to it one-half the cost of so doing. On default of the railroad company to keep the bridges in repair, the traction company was given the right to make the repairs, the railroad company agreeing to pay to it one-half the cost thereof. The agreement gave the traction company the right to cross the steam railroad in two places at grade, the railroad company agreeing to construct and maintain the necessary frogs and crossings for the trolley company, at the expense, however, of the latter. The agreement contained specific stipulations on the part of the traction company as to the mode of guarding the safety of the grade crossings. It was further provided that in case, at any future time, gates or flagmen, or both, should be required upon said crossings by any public law of the state or by municipal action, the cost of construction, maintenance and operation of gates, and the wages of flagmen, should be borne equally by the railroad company and the traction company.

The stipulation upon which the present action was based is this: That the traction company should pay each year to the railroad company fifty per centum of any decrease in the annual passenger earnings of the latter company below its passenger earnings during the fiscal year next preceding the making of the agreement; this stipulation to go into effect at the completion of the traction road and the commencement of operations thereon between New Brunswick and South Amboy, and to continue in force for the period of ten years thereafter, or until the payments made thereunder should equal the sum of $14,000, in which event further payments should cease. Pending the life of the stipulation

just mentioned, the railroad company agreed that it would not "lower its present rates of fare unless required by law;" if it should be required by law to lower its present rates of fare for passengers, the loss to be made up by the traction company should be computed upon the basis of the regular rates of fare in force at the date of the agreement. When the total payments made by the traction company to the railroad company under this stipulation should equal the sum of $14,000 the payments were to cease, and the agreement as to rates of fare should also cease. The agreement at the same time reserved to the railroad company the right, on notice to the traction company, to abrogate the agreement as to rates of fare by giving up all claim to the portion remaining unpaid of the $14,000.

The agreement of June 1st, 1900, contains nothing necessary to be now mentioned beyond an express assumption by the Middlesex and Somerset Traction Company of the covenants and agreements of the Brunswick Traction Company contained in the instrument of September 17th, 1895.

By the judgment under review the railroad company recovered damages equivalent to fifty per cent. of the decrease in its passenger receipts for the first year that the traction road was in operation, as compared with the receipts of the fiscal year that by the agreement was made the standard for purposes of comparison.

Reversal of this judgment is sought on the ground that the agreement to pay to the plaintiff one-half of the decrease in its annual passenger earnings is void for want of lawful consideration moving from the plaintiff, and on the ground that an inseparable part of the consideration is illegal as contravening public policy.

In our opinion the stipulation of the railroad company to bear one-half the cost of maintaining the overhead bridges, when strengthened in such a manner as to provide for the increased burden of traffic caused by the operation of the traction road, furnishes a lawful consideration for the reciprocal stipulations of the traction company. The general duty of

the railroad company to maintain those bridges arose from the fourteenth section of the General Railroad law as amended in 1891. *Pamph. L., p.* 169; *Gen. Stat., p.* 2661. Aside from the liability to indictment for non-repair and the liability to damages at the suit of parties specially injured through such non-repair, the only direct methods of enforcing the obligation of the railroad company were those prescribed by section 14, viz., either by proceedings in chancery at the instance of the municipal authorities to compel specific performance of the duties imposed upon the company, or by action of those authorities in proceeding to repair the bridges on the company's default so to do, recouping the cost from the company by action at law.

It is not necessary now to question whether the continuing obligation of the railroad company to keep up the bridges in accordance with the growing demands of travel extends to their reinforcement and maintenance under the extraordinary weight of trolley tracks and roadbed and the operation of trolley cars. Assuming that to be so, the traction company was still (in the absence of agreement of the railroad company) left in the situation of a member of the general public, having a great practical interest in the proper performance of this public duty by the railroad company, but without direct means of its own to specifically enforce such performance, and without redress for non-performance unless it should be specially damnified. Under these circumstances, an agreement settling as between these parties that they would equally bear the expense of maintaining the improved bridges, and giving to the traction company the right to do the repairs and charge one-half the cost to the railroad company, tended to avoid litigation between the parties about the matter, and had such value to the traction company as to furnish consideration for its reciprocal stipulations. With the adequacy of that consideration we are not in this action concerned.

For like reasons it seems to us that the consent of the railroad company to the grade crossings, and its stipulation

to share in the expense of maintaining the same, furnish a valuable consideration to the agreement.

But that consent and stipulation are attacked as void in law and contrary to public policy in that they contravene the provisions of the act of 1895 for regulating the crossing of steam railroads by steam or electric railroads thereafter to be constructed. *Pamph. L., p.* 462; *Gen. Stat., p.* 2717. That act declares, in substance, that "whenever the route of any steam or electric railroad shall cross at points outside of the limits of cities the line of any steam railroad, such crossing shall be made in such a way as will inflict the least injury upon the rights of the company owning or operating the railroad intended to be crossed, and as will afford proper protection to the public; and no company shall hereafter construct any electric railroad across the line of any steam railroad, except within the limits of a city, until it shall have first made application to the Chancellor to define the mode in which such crossing shall be made; and it shall thereupon be the duty of the Chancellor, after causing reasonable notice of such application to be given to the municipal authorities, and also to the corporation owning or operating the railroad intended to be crossed, to define by his decree the mode in which such crossing shall be made, and if in his judgment it is reasonably practicable and public safety so requires, to avoid a grade crossing, he may, in his discretion, by his decree define and regulate the mode and manner of such crossing, and thereupon such crossing shall be made in the mode defined by such decree, and in no other way." Crossings in cities are left subject to the existing laws.

In our view, however, the prohibition of this statute is intended for the benefit of the parties named in it. There is no penalty imposed as for a public offence. The railroad company, the traction company and the municipal authorities, are all made by statute the representatives of different public interests. The functions of the Chancellor under this statute, as we regard it, are purely judicial. He is to hear and judicially determine the cause *inter partes*. It is a statutory

extension of the general jurisdiction of the Court of Chancery exercised over parties having conflicting easements upon the same soil, to so regulate them that the enjoyment by each party shall not be unduly detrimental to the interests of the other. Instances of the exercise of the general jurisdiction may be noted. *National Docks Railway Co.* v. *Pennsylvania Railroad Co.*, 9 *Dick. Ch. Rep.* 142; 10 *Id.* 820; *Consolidated Traction Co.* v. *South Orange, &c., Traction Co.*, 11 *Id.* 569, 584; *Jersey City, H. & P. Ry. Co.* v. *New York, &c., Ry. Co.*, 17 *Id.* 390. The act of 1895 provides a more summary method of procedure and gives a definite *status* in court to the public authorities.

The argument for the plaintiff in error is to the effect that the statute makes it a public offence to construct a grade crossing without first obtaining an order of the Chancellor, and that an agreement to construct such a crossing is, therefore, not only void but a breach of the law. But suppose the crossing is constructed without such consent, what penalty is the wrongdoer to suffer? A statute that denounces an act as a public offence ought to provide some sanction for its enforcement. 1 *Blackst. Com.* 54; *Bouv. Dict., tit. "Sanction."* Is the Chancellor, of his own motion, to issue an injunction; is he to constitute himself the guardian of the general public interests? That would render him both *actor* and *judex*. It would require clear statutory language to impose upon a high judicial officer duties so incongruous. We find none such in the act before us.

But if the statute were to be so construed as to render it a public offence to construct such a crossing without previous application to the Chancellor, the result now to be reached would not be different. The agreement under consideration contains no language that either expressly or by implication forecloses such an application. It contains no stipulation that the parties will proceed to construct the crossing without the Chancellor's consent. There is nothing in it that tends to impede, much less debar, action by the municipal authorities by the attorney-general, or by the Chancellor, towards

the protection of the safety of the public. It simply confers the right of crossing as between the parties, so far as they have power to confer it, and evinces their consent to the method of crossing as defined by them.

In our opinion the railroad company and the traction company, notwithstanding the act of 1895, were at liberty to make such an agreement between themselves, and the agreement, if otherwise lawful, cannot be held void, because made without proceedings first taken in chancery to define the mode of crossing.

It is further insisted that the stipulation of the railroad company (the plaintiff), "not to lower its present rates of fare unless required by law," furnishes an inseparable part of the consideration for the covenant of the defendant now sued on; that the stipulation quoted is contrary to public policy and void; and that this illegality vitiates the defendant's covenant.

Section 15 of the General Railroad law (under which act the plaintiff was incorporated) declares in substance that "any such company shall have power and be authorized to demand and receive such sums of money for the transportation of persons and property as it from time to time shall think reasonable and proper; *provided*, that said company shall not charge more than three cents per mile for carrying each passenger, and tickets for passengers shall be good until used, but no charge shall be required in the aggregate to be less than ten cents, nor shall said company charge more than ten cents per mile per ton for the transportation of any description of property," &c.  *Gen. Stat., p.* 2643, § 15. A similar provision, as to passenger fares, is found in the recent revision of the General Railroad law. *Pamph. L.* 1903, *p.* 665, § 38.

If a similar phrase, "and such sums of money as it from time to time shall think reasonable and proper," were embodied in legislative instructions to public trustees, acting without legitimate interests of their own, we should have no difficulty in ascribing to the language the meaning that is suggested here, that is, that the trustees must act in view of what the public interests require, and must not foreclose themselves by

any consideration of personal benefit from the free exercise of their judgment from time to time in view of what may be reasonable and proper as well from the standpoint of the public as from that of the corporation. The case would be nearly parallel to *Barrett* v. *Bloomfield Savings Institution,* 19 *Dick. Ch. Rep.* 425, where Vice Chancellor Pitney pointed out (at *pp.* 433, 441) that under our statutory system the managers of savings institutions are trustees of a public franchise, held for the benefit of the public at large, so that when the legislature authorized them to dissolve the institution if they should deem it advisable, it intended to say advisable from the standpoint of the interests of the depositors and of the public and not from the standpoint of the interests of the managers. His reasoning was adopted by this court on appeal. So this court held in *Hope* v. *Linden Park Association,* 29 *Vroom* 627, that an agreement, which tends to control or restrict the free exercise of a discretion for public good, vested in one acting in a public official capacity, is illegal.

The argument for the plaintiff in error would have us to apply the same doctrine to the discretionary power that the legislature has conferred upon railroad companies to establish from time to time, within certain limits, the rates of fare to be charged for transportation of passengers and merchandise. Now, while it is true that railroad corporations are, in a general sense, a public agency, their property being impressed with a public use and its administration being subject to regulation by law in the interests of the people at large, it is not in this aspect that power is conferred upon the company by the section above quoted to fix the rates to be charged for transportation. That section touches upon a matter in which there is, in every given case, a direct antagonism between the legitimate interests of the railroad company and the interests of the public. The companies are organized primarily for the purpose of making a profit out of the transportation of freight and passengers. The General Railroad law is based upon the theory that the public good is promoted by inviting capital to

embark in such enterprises, the control and management of the roads being vested in the proprietors thereof, to the end that their capital may receive adequate returns. In fixing the rates of freight and fare it is manifest that the primary interest of the company is in the direction of higher rates, while the primary interest of the passenger or shipper lies in a direction diametrically opposite. The construction of section 15, suggested by the learned counsel for the plaintiff in error, attributes to the legislature a design to establish a *quasi* judicial tribunal for the purpose of determining what is reasonable and proper from the standpoint of the public as well as from that of the company, *and to make the company itself the sole member of that tribunal.* The legal impossibility of such an arrangement results from its practical futility. "No man may be made a judge in his own cause." This maxim results not from any constitutional limitation but from the inherent limitations of human nature, that are necessarily present in all systems of human government.

It follows that language, which would require the exercise of a judicial discretion if it were addressed to a party so situated as to be able to act impartially, must mean something very different when knowingly addressed to a party that by reason of its legitimate and inevitable interest in the subject-matter of arbitrament can by no possibility act without bias. Thus, when the legislature, in framing this general act for granting and regulating railroad franchises, having within its hands full power to impose specific conditions respecting rates and terms for carriage of freight and passengers, representing in itself the people whose interests were in a sense antagonistic to those of the railroad companies in the matter of rates, instead of fixing a specific scale or establishing an impartial tribunal for their regulation, said to the companies: "We reserve the right to repeal and modify the power and authority now conferred upon you; in the meantime we limit your passenger fares to three cents per mile per passenger and your freight charges to ten cents per mile per ton; and subject to those limitations we authorize you to demand such sums

of money for the transportation of persons and property as *you*—the party whose interests are opposed to those that we represent—shall from time to time think reasonable and proper," it expressed as emphatically as possible the notion that an uncontrolled discretion was vested in the company to establish such rates as its own interests should from time to time require, subject only to the maximum rates prescribed and to the right of repealer and modification that was expressly reserved in the act. *Gen. Stat., p.* 2647, § 39.

Any construction of section 15 of the act that places the railroad company in the attitude of an impartial arbiter as between it and the public, being thus found inadmissible because it runs counter to fundamental principles, we have before us a statutory scheme which in terms confers upon the company an uncontrolled discretion to subserve its own interests in making, and from time to time changing, the rates of fare and freight, subject only to the maximum rates prescribed and to further legislative action from time to time thereafter. It is too plain for argument that the policy of the law, so far as expressed in this statute, is not violated by an agreement made between the railroad company and a would-be competitor that during a limited period the former company will not reduce fares unless required by law.

Where, then, shall we look for any public policy to the contrary? Public policy is to be sought for in the rules of the common law, as modified by the acts of the legislature. It is for the law-making authority, and not for the courts, to declare it.

Certainly the courts have no general supervisory authority over the question of freight and passenger rates. Their concern in the matter is confined to cases where the question of "reasonable rates" is raised, incidentally, in the ordinary course of judicial inquiry. Railroad companies, as common carriers, pursuing a public calling under such circumstances that the public must of necessity deal with them, are limited by the rules of the common law, in the absence of any statute, to the imposition of reasonable rates of fare and

toll.   On the additional ground that their property is devoted to a public use, they are subject to the like limitation, and their use of the property is subject to be controlled by the public for the common good, within limits fixed by the constitution.   Where controversies arise *inter partes,* the courts judicially determine what are reasonable rates.   In so doing, they follow common law rules in the absence of statute; where there is a statute, the courts follow the rule of law thus prescribed; where the statute violates the constitution, as by prescribing rates so low as to be unremunerative, so as to amount to a taking of property without compensation or without due process of law, the courts follow the constitution, disregarding the statute.   *Munn* v. *Illinois,* 94 *U. S.* 113, 134; *Chicago, &c., Railroad Co.* v. *Iowa, Id.* 115, 162; *Peik* v. *Chicago, &c., Railway Co., Id.* 164, 178; *Ruggles* v: *Illinois,* 108 *Id.* 526; *Chicago, &c., Railway Co.* v. *Wellman,* 143 *Id.* 339; *Reagan* v. *Farmers' Loan and Trust Co.,* 154 *Id.* 362, 397, 399; *St. Louis and San Francisco Railway Co.* v. *Gill,* 156 *Id.* 649; *Smyth* v. *Ames,* 169 *Id.* 466, 522.

But the power to require a public service to be performed for a limited rate is but a branch of the power to regulate, in the public interest, property that is devoted to the public use.   This is primarily the function of the law-making body. The courts may, in a given instance, be called upon to decide, in the course of litigation, whether a certain rate is reasonable or unreasonable, or to declare that a given statutory limitation is confiscatory, but the courts have no power to declare in general what rates shall not be exceeded.

In view of the positive statutory declaration contained in section 15 of the General Railroad law, construed as we construe it, we are unable to conceive on what rational ground the court can properly declare that any public policy requires that the rates shall be maintained below the maximum rates fixed in the statute.   That limitation, and the discretion that is conferred upon the company with respect to lesser rates, are the deliberate expression of the law-making power, and

the measure of its regulation in this behalf of property devoted to public use under the General Railroad law. That statute binds the courts, unless it transcends some constitutional limitation. Nothing of this sort is suggested.

We are of the opinion, therefore, that the defendant's covenant on which this action is based was founded on a good and lawful consideration, and is not vitiated by illegality of consideration.

The judgment under review will be affirmed.

GARRISON, J. (dissenting). I vote to reverse upon the ground that the power granted to the railroad company to receive such sums as fare "as it shall from time to time think reasonable and proper," is not one of which it can deprive itself for a stated period for a pecuniary consideration.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRETSON, HENDRICKSON, PITNEY, SWAYZE, BOGERT, GREEN. 8.

*For reversal*—DIXON, GARRISON, VREDENBURGH, VROOM. 4.