## YELLOW CAB COMPANY v. PEARL TELLER.

Western Section.   March 28, 1929.

Petition for Certiorari denied by Supreme Court, June 15, 1929.

Wilson, Gates & Armstrong, of Memphis, for appellant.
Bates, Shea & Frazer, of Memphis, for appellee.

OWEN, J.   Pearl Teller, hereinafter called plaintiff, recovered a judgment in the circuit court of Shelby county for three thousand two hundred fifty ($3250) dollars.   The defendant, Yellow Cab Company, has appealed.

The plaintiff, while riding as a passenger in a cab owned and operated by the defendant on the streets of Memphis, Tennessee, was injured.   The accident occurred April 15, 1927.   The plaintiff was returning to her home in Memphis, she had been on a visit to Forrest City, Arkansas, she arrived at nighttime at the Grand Central Station.   Upon entering the station she was solicited by a driver of the defendant to take a cab, she gave directions to the driver to take her home, 800 Jefferson avenue.   Just before reaching her home the driver of the taxi ran into a telephone pole injuring the plaintiff. She was taken to the hospital, later on suit was instituted.   She alleged that the defendant was a common carrier and that through the

negligence of the defendant's driver she was seriously injured. The defendant filed its plea of not guilty, a plea of contributory negligence and also as a defense the defendant relied upon a certain ordinance of the City of Memphis that a man by the name of Fields violated said ordinance, Fields drove his car, in violation of said ordinance, into Jefferson street and the driver of the Yellow Cab Taxi was forced to dodge Fields car and in so doing the accident happened, it being insisted that Fields drove out of Neely street into Jefferson street without obeying a stop sign and it was Fields' negligence that was the proximate or intervening cause that caused said accident.

The defendant seasonably filed its motion for a new trial which was overruled, an appeal was perfected and errors are assigned in this court.

The defendant relies upon two errors. First, that the court charged the jury that the defendant was under a legal duty to use the highest degree of care, and second, that the verdict is excessive.

That part of the court's charge in which it is insisted that this was error is as follows:

"First, what legal duty rested upon the defendant, the Yellow Cab Company? The law is that, where one seeks passage in a cab company, or one of the cabs of the company, as disclosed in the evidence here, then the law puts the duty upon the defendant of exercising the highest practical degree of care for the safety of the passenger. That does not mean, gentlemen of the jury, that the defendant is an insurer of the safety of one of its passengers. If that were so, it would only be necessary, for the plaintiff to show that she was a passenger, and that while a passenger she was injured, for her recovery. That is not the rule; the defendant is not an insurer, but the defendant is under the duty of exercising the highest practical degree of care, under the circumstances, for the safety of its passengers. That means, gentlemen of the jury, taking into consideration all the facts and circumstances surrounding the defendant, the kind of vehicle that the defendant was operating, the kind of business that the defendant is engaged in, the kind of street that the defendant was then operating its cab on, the conditions of the weather, the speed of the taxicab, the control that the driver had over it. Take into consideration all of those things, and say whether, or not the defendant measured up to the highest practical degree of care of one under those circumstances. If it did that, then the defendant would not be guilty of negligence. If the defendant fell below that standard, then the defendant would be."

It is insisted that this was error because there was no proof to establish the fact that the Yellow Cab Company was engaged in business as a common carrier nor that it held itself out generally as a carrier for all who might apply as passengers.

We find in the transcript that the plaintiff among other things testified as follows:

"Q. What did you do with reference to getting home after you alighted from the train in Memphis? A. Well the first taxicab driver who came to me, I gave him my bag, and took a taxicab.

"Q. Where did you meet this taxicab driver? A. He was at the entrance as I went in the gallery at the station.

"Q. He was in the station? A. Yes, sir.

"Q. What kind of a cab was it? A. It was a Yellow Cab.

"Q. Do you know whether or not, the Yellow Cab Co., the defendant in this case, is a carrier of passengers for the hire in the City of Memphis? Did you hire a cab that night? A. Yes, sir.

"Q. Well is the Yellow Cab Company, if you know, a carrier of passengers for hire in the City of Memphis? A. Yes.

"Q. I understood you to say that their chauffeurs or agents were in the depot soliciting passengers on the night you came in, which was the night of the accident? A. Yes, sir; and they are every time I come in on the train.

"Q. They are every time? A. Yes, sir.

"Q. Do you recall just what you were doing, or what was occupying your attention at the time of the accident? A. Well, I was looking at the meter at the time the accident happened.

"Q. You were looking at the meter at the time the accident happened? A. Yes, we were almost home, and I was looking down at the meter. I had been on the streets in Forrest City, and it was higher and I was anxious to get home, and looked down to see what my bill was going to be. I realized that I was almost home."

Dr. Ireland testified as follows:

"Q. And who sent you there, or at whose request did you go there? A. I went there at the request of the Yellow Cab Company, of the manager of the company, that was on duty at that time."

"Q. Were your services, or not, engaged by the Yellow Cab Company generally." A. Yes, sir.

"Q. And that company operates what is known as the Yellow Cab Company of Memphis? A. Yes, sir."

In addition to the plaintiff's testimony we find from the evidence of Fields, the chauffeur who was driving the plaintiff at the time of the accident, and F. T. Shelton, Assistant to the General Superintendent of said company, and Dr. Ireland who was sent to the hospital the night of the accident to see the plaintiff, Dr. Ireland being the regular retained surgeon for the defendant; that it is established that the defendant company owns and operates taxicabs in the City of Memphis, for the purpose of conducting its business it operates two garages, employes a surgeon, superintendent and assistant superintendent, a cashier, mechanics, drivers or chauffeurs, checkers, who read the meters when the chauffeurs or drivers are changed and various other employees. This company operates both day and night in the City of Memphis. The defendant's taxicabs are equipped with meters so that the fair charged is uniform, this meter computes the fair.

The taxicab in which Mrs. Teller was injured was one of those owned and operated by the Yellow Cab Company and the driver of the taxicab was employed by the company for the purpose of driving the taxicab and soliciting business for the company. The money taken in from passengers is turned over to the cashier of the Yellow Cab Company.

The company is a carrier of passengers for hire in the City of Memphis and has cabs and drivers stationed about the city for the purpose of soliciting passengers and transporting them. On the day the plaintiff was injured the driver of the taxicab involved in the accident was stationed at the Grand Central Station soliciting passengers for the Yellow Cab Company. The company was in the habit of having men stationed at the Grand Central Station soliciting passengers.

On April 15, 1927, the plaintiff alighted from a train and for hire employed a Yellow Cab to take her to 800 Jefferson avenue. The particular cab she rode in had been in service all day. The chauffeur and agents of the Yellow Cab Company on the day of the accident and every time the plaintiff had come in on a train were soliciting at the station passengers for the Yellow Cab Company.

Counsel for the defendant insists that in order to show that a taxicab company is a common carrier, it is necessary to show that it holds itself out to carry all persons who apply for passage indifferently, and that it does do so, for a uniform price, citing: N. & C. R. R. Co. v. Massino, 1 Sneed, 220; McGregor v. Gill, 114 Tenn., 521; E. S. Carlton v. Boudar, 118 Va. 88 S. E., 174; Darnell, Admr. v. Fidelity & Casualty Company of New York, Unreported.

In the case of Railroad v. Massino, our Supreme Court said:

"A common carrier of passengers is one who undertakes, for hire, to carry all persons indifferently who may apply for passage. It is not essential that the fare should be paid in advance, or tendered, to establish the relation and reciprocal duties of carrier and passenger; it is enough that it is understood that it is to be paid.

"To constitute one a common carrier it is necessary that he should hold himself out to the community as such. This may be done not only by advertising, but by actually engaging in the business and pursuing the occupation as an employment. It is not, however, every carrying of passengers for hire that constitutes a party a common carrier. A party having the convenience for carrying persons may in some, or perhaps many, cases carry passengers for hire, when done at the instance of passengers and for their accommodation, without incurring the responsibilities of common carriers. These would be rules much less stringent."

It is further insisted that the proof in this case does not show that the defendant carries all persons indifferently who apply for passage. It is insisted that the proof shows that the chauffeur solicited passengers in the railroad station but the proof fails to show that the chauffeur solicited passengers indifferently or that they do not reserve the right to select those whom they would solicit and carry.

We find throughout the record in this case that the word taxicab is used, while there is no explanation in the record of the word taxicab, we know by observation and knowledge that this is a term or word in common or general use as much so as if the word airplane is used or railroad. The court and jury would understand what is meant if the witness used the word railroad, or the word airplane or the word automobile, just as the court and jury understood the witnesses, in the instant case, when they talked about a taxicab.

The Supreme Court of the United States points out the distinction between common carriers and private carriers for hire in the case of Terminal Taxicab Company, Inc. v. District of Columbia, 241 U. S., 252.

In that case the Public Utilities Commission of the District of Columbia attempted to exercise jurisdiction over complainant taxicab company. Under the terms of the act creating the commission it was provided that "Every public utility is hereby required to obey the lawful orders of the commission" and that "public utility embraces every common carrier which phrase in turn is declared to include every corporation . . . controlling or managing any agency or agencies for public use for the conveyance of persons or property within the District of Columbia for hire.

The complainant was a corporation which operated in three different ways. (1) Had exclusive right to solicit livery and taxicab business from all persons passing to or from trains in the Union Station, in return for this right agreeing to keep sufficient cabs at said station to accommodate passengers. (2) Exclusive right to solicit passengers about certain hotels, limiting its solicitation to guests, and (3) the furnishing automobiles from its central garage on orders, generally by telephone, the company reserving the right to refuse the service.

The Supreme Court of the United States held the first two methods of business that of a common carrier and in so far as those phases of the business were concerned under the jurisdiction of the commission. As to (3) above that phase of the business was held to be that of a private carrier for hire and not under the jurisdiction of the committee.

In speaking of (1) and (2) above which facts, particularly (2) apply to the instant case, the court speaking through Mr. Justice Holmes on page 254 said:.

"It may be assumed that a person taking a taxicab at the station would control the whole vehicle both as to contents, direction, and time of use, although not, so far as indicated, in such a sense as to make the driver of the machine, his servant according to familiar distinctions. The last facts however, appear to be immaterial, and in no degree to cast doubt upon the plaintiff's taxicab when employed as above stated being a public utility by ancient usage and understanding. Munn v. Illinois, 94 U. S., 113, 125, as well as common carriers by the manifest meaning of the act."

From the proof and the decision in the Terminal Taxicab Company case it may be seen that the defendant is not a private carrier for hire. It does not hold its cabs at a central office, await calls and pick and choose its passengers. The Yellow Cab Company stations its cabs at various places in the city and solicits the public to ride, the meter on the cab guaranteeing that all who ride pay a uniform rate. It does the business of (1) and (2) of the Terminal Taxicab Company.

Huddy on Automobiles (6th Ed.), page 197, says:

"Common carriers of passengers, among whom are to be classed jitneys, taxicabs, and other vehicles carrying passengers for hire, are bound to exercise a high degree of care for the safety of their passengers."

Again on page 42, Huddy says:

"An automobile may be used as a common carrier, a private carrier, or a personal private conveyance. Public motor vehicles,

such as sightseeing cars, taxicabs, and others which are employed on carrying all persons applying for transportation, come within the definition that a common carrier of passengers is one who undertakes for hire to carry all persons who may apply for passage."

"In the class of common carriers of passengers are included not only railroads, horse, dummy, electric, and cable street railways, and steamship companies, but proprietors of stage coaches, city omnibus lines, hackmen and ferrymen, including proprietors of taxicabs and other motor vehicles engaged in public transportation." 5 Am. & Ency. of Law (2 Ed.) 134.

Huddy on Automobiles (6th Ed.), on page 151, defines taxicab as follows:

"The term 'taxicab' is a coined name to describe a conveyance similar to a hackney carriage by electric or steam power, and held for public hire at designated places, subject to municipal control."

We find the following in Babbitt's The Law Applied to Motor Vehicles, section 162:

"A taxicab is 'a public conveyance provided for passenger service' under the terms of an accident policy. Hence a taxicab company organized for the carriage of persons for hire and holding itself out as ready to receive and transport all who may apply for passage and were ready to pay compensation for the service is a common carrier."

The case of McGregor v. Gill, supra, relied on by the defendant, involved the liability of a liveryman who was not a public carrier in that case and the law governing the same is not applicable to the present case because the liveryman did not carry the public generally or meet the trains and solicit passengers.

We are of the opinion that the facts established in the instant case warrant the trial judge to charge the jury as he did charge. We find proof establishing the fact that the defendant was a public carrier. The first assignment is overruled, as to the second assignment, we find a verdict of $3250 approved by the trial judge.

The plaintiff was seriously injured in her back. Dr. Ireland, the surgeon for the defendant company, examined this plaintiff the night of the injury and many months after the injury and found her still suffering with a pain in her back at the same place Dr. Ireland found her suffering the night he visited her in the hospital, the night of the accident. She was still suffering at the time of the trial, which was eighteen months after the accident. She expended $323 for doctors' bills, hospital and medical accounts. She had to wear a brace at the time of the trial. She had been treated by a number of physicians and surgeons among them Dr. Joseph Mitchell, Dr. W. W. Bond and

Dr. Willis Campbell who applied the brace to the plaintiff's back and hip. The plaintiff was in the hospital nine days and in the bed in her home for a number of months. Plaintiff testified that she was earning $50 a week at the time she was injured. The proof shows that the taxicab was going about thirty-five miles an hour at the time it struck a telephone pole, the plaintiff was thrown from the seat across a foot-warmer which caused her back to be injured. The trial judge and jury saw this plaintiff, heard her testify, saw her condition, heard the evidence of the Doctors with the.result that a verdict was returned in favor of plaintiff for the amount heretofore stated. Under all the facts and circumstances we cannot say that this.verdict is excessive, it is insisted that the plaintiff was not making $50 a week selling books, that she failed to produce her books or records and show what she had earned just prior to the accident. She was asked to get the records at the noon recess on the day of the trial, she testified in the afternoon that she did not have time to go home and produce the records called for by the defendant.

We are of the opinion that this was a reasonable excuse for not producing her records and the jury and trial court looked at it in that way, we do not think that the plaintiff was wilfully withholding any information. It results that all the assignments of error are overruled, the judgment of lower court is affirmed. The plaintiff will recover of the defendant, the amount of the judgment rendered in the lower court with interest thereon from the date of its rendition and all the costs of the cause for which execution will issue. Execution will issue against the defendant and its surety on appeal bond for the cost of the appeal.

Heiskell and Senter, JJ., concur.